Argued January 26, reversed April 25, rehearing denied May 23, 1922.

## ALLEN *v.* HENDRICK.

## IN RE ESTATE OF GEORGE R. HENDRICK, DECEASED.

(206 Pac. 733.)

**Trusts—Created in Personalty by Writing or Orally.**

1. The owner of personal property can create a trust either orally or by writing.

**Evidence—Trust Created by Writing not Varied by Parol.**

2. If a writing is employed to create a trust, its terms cannot be varied by parol.

**Evidence—Extrinsic Evidence Inadmissible to Construe Unambiguous Contract.**

3. Where the language of a writing is clear and unambiguous, extrinsic evidence is not admissible to aid the construction, but where the language is ambiguous or susceptible of conflicting interpretations, evidence of the circumstances under which the writing was made is admissible.

**Evidence—Where Letter Relied on to Create Trust was Ambiguous, Prior Letters and Oral Statements of Settlor Admitted to Ascertain Meaning of Words Used.**

4. Where the language of a letter relied on to create a trust was not, when standing alone, free from ambiguity, and was susceptible of more than one construction, prior letters and oral statements of the decedent and acts done by him were admissible to ascertain the meaning of the words used by the letter.

**Gifts—To Effect "Gift Inter Vivos" Donor must Divest Himself of Thing Given.**

5. To effect a gift *inter vivos*, a donor must divest himself of the thing given and transmit the title to it to the donee gratuitously, and the gift operates immediately.

**Gifts—Conditional Delivery Defeats Gift Inter Vivos.**

6. A delivery accompanied with a condition which constitutes a condition of delivery or of title prevents the consummation of a gift *inter vivos*.

**Gifts—"Gift Causa Mortis" Defined.**

7. A gift *causa mortis* is a gift of personalty made under apprehension of the approach of death from some existing disease or other impending peril, with the implied condition that it shall take effect absolutely only upon the death of the donor, caused by the disease from which he is then suffering or the peril impending.

**Gifts—Gift Causa Mortis Subject to Conditions Implied by Law.**

8. A gift *causa mortis* is made subject to three conditions implied by law, the occurrence of any one of which will defeat the gift: (1) Recovery of the donor from sickness or delivery from

6. Revocability of conditional gift *inter vivos*, see note in Ann. Cas. 1915D, 695.

7. Gifts *causa mortis*, see note in 99 Am. St. Rep. 890.

For authorities discussing the question as to the general rule that parol evidence not admissible to vary, add to or alter the terms of a written contract, see notes in 56 Am. St. Rep. 659; 17 L. R. A. 270.

As to whether donor's expectation that the donee will allow him to share in the benefit of the property raise an implied trust to that effect, see note in 24 L. R. A. (N. S.) 1043.

As to whether delivery of personalty to third person with directions to deliver after donor's death is valid gift, see note in 3 A. L. R. 902.

peril; (2) *revocation before death;* (3) *death of donee before death of donor.*

#### Gifts—"Gifts Inter Vivos" and "Gifts Causa Mortis" Distinguished.

9. In both classes of gifts title is transferred and vested in the donee, but, in case of a gift *inter vivos*, the title is not only transferred and vested but the gift is immediately completed and is irrevocable, while in a gift *causa mortis*, although there is present transfer of title, the transfer may be defeated by the happening of one of the conditions implied by law.

#### Gifts—Certificates of Deposits Mailed to Son Held not a Gift.

10. Where a father mailed deposit checks to his son, with a letter stating "you will keep safely for me in case I come to need any part or all of them and if I never need them they are all yours when I am done with them," *held*, that the certificates were not delivered as a gift *inter vivos*, nor did the circumstances sustain a gift *causa mortis*.

#### Gifts — Letter of Claimant Interested in Litigation of Estate Written Shortly After Decedent Died Incompetent.

11. A father mailed deposit checks to a son with a letter directing that the son should keep the checks in case the father needed any part or all of them or if the father never needed them they were to be the son's, and, in an action by the father's administrator for possession of the checks, where there was nothing in the record disclosing that the checks were intended as a gift *causa mortis* and no evidence of impending illness of the father, a letter written by another son shortly after the father's death, which contained statements about the father's condition, was incompetent.

#### Trusts—Owner of Personalty may Create Trust by Delivery and Transfer of Title to Trustee for Another's Benefit.

12. The owner of personalty may create a trust in it by delivery and transfer of title to a trustee, to be held for the benefit of another.

#### Gifts—Distinguished from "Gift Inter Vivos"—"Voluntary Trust."

13. The difference between a gift *inter vivos* and a voluntary trust is that, in a gift, the thing itself with title passes to the donee, while, in a voluntary trust, the actual title passes to a *cestui que trust* while the legal title is retained by the settlor, to be held by him for the purposes of the trust or is by the settlor transferred to another to hold for the purposes of the trust.

#### Trusts—Voluntary Trust must Operate as Present Transfer.

14. To be effective, a voluntary trust must so operate as presently to transfer an interest in the thing, and the legal estate must be separated from the beneficial enjoyment, and the moment the two estates merge in the same person the trust ends.

#### Trusts—Implies Legal and Equitable Estates.

15. A trust implies two estates, one legal and the other equitable, and also that the legal title is held by the trustee, while another, the *cestui que trust*, has the beneficial interest.

Remainders—Personalty may be Limited by Way of Remainder.

16.   Personal property may be limited by way of remainder, after a life interest created at the same time.

Trusts—Created for Benefit of Settlor During Life With Remainder Over.

17.   A trust may be created for the benefit of the settlor during his life, with remainder to other persons.

Trusts—Power of Revocation may be Reserved.

18.   The power of revocation may be reserved by the creator of a trust and if not exercised during his life, the trust remains unaffected and such reservation does not affect the legal title of the property, for that passes and remains vested for the purposes of the trust, notwithstanding the existence of the right to revoke.

Trusts—Letter Creating Trust Held not to Reserve Right to Revoke.

19.   Where father mailed deposit checks to a son, with a letter that the son should "keep safely for me in case I come to need any part or all of them and if I never need them they are all yours when I am done with them," *held,* that the father did not reserve the right of revocation.

Trusts—No Objection That Trustee a Beneficiary.

20.   It is no objection to the validity of a trust that the trustee is one of the beneficiaries.

Wills—"Trust" Distinguished from "Will."

21.   The difference between a will and a trust is that a will operates from the moment of death, while a trust operates in *praesenti* to a certain extent.

Trusts—Settlor may Make His Death the Event a Future Interest Comes into Possession.

22.   A settlor of a trust may make his death the event on the happening of which the estate in interest, previously vested in *praesenti* but to be enjoyed in *futuro,* is to come into possession.

Trusts—Enjoyment of Estate in Future Does not Negative Creation of Present Interest.

23.   That the enjoyment of a trust estate is postponed to a future date does not negative the idea that a present interest is created in favor of persons for whose benefit the trust is declared.

Wills—Postponement of Enjoyment Until Settlor's Death not Decisive of Testamentary Character.

24.   That an instrument postpones the enjoyment of the subject matter until the death of the settlor is not decisive that the instrument is testamentary in character.

Wills—Test Whether Writing Creates Trust or is Testamentary Stated.

25.   The test whether a writing has effected a trust or is testamentary in character is whether the maker intended the instrument

to have any effect until after his death or whether he intended to transfer some present interest.

**Trusts—No Particular Words Required to Create.**

26.  No particular form of words is required to create a trust and whether one exists is to be ascertained from the intention of the party, as manifested by words used and the surrounding circumstances.

**Trusts—Use of Words Trust or Trustee not Essential to Create.**

27.  To create a trust, the use of the words "trust" or "trustee" is not essential, but it is sufficient if the language used shows that the settlor intended to create.

**Trusts—Intention to Create must be Proved.**

28.  The intention to create a trust must be clearly proved, and the language used must be such as to disclose with certainty an intention to create; there must be either explicit language expressing the trust or circumstances showing with reasonable certainty that a trust was intended.

**Trusts — Letter and Surrounding Circumstances Held to Create Trust in Son in Deposit Checks Received from Father.**

29.  Where deposit checks were mailed by father to his son, with a letter stating "you will keep safely for me in case I come to need any part or all of them and if I never need them they are all yours when I am done with them," as supported by evidence of other letters and explanatory circumstances, *held* to create a trust in the son entitling him to the certificates.

From Washington: GEORGE R. BAGLEY, Judge.

Department 1.

The plaintiff, George S. Allen, administrator of the estate of Geo. R. Hendrick deceased, brought this suit against George E. Hendrick and the Forest Grove National Bank of Forest Grove, Oregon; and, alleging that he was entitled to the funds represented by two time certificates of deposit issued by the bank to ·Geo. R. Hendrick, but in the possession of the defendant George E. Hendrick, the plaintiff prayed for a decree adjudging the ownership of the certificates to be in the estate of Geo. R. Hendrick, deceased, and restraining the bank from recognizing or paying the certificates until the ownership of them could be determined. A trial resulted in a

decree for the plaintiff. The defendant George E. Hendrick appealed.

Upon the commencement of this suit the bank was enjoined from paying the certificates until the court adjudicated the ownership. The bank occupies the position of a stakeholder; for the bank has been able and willing, since the maturity of the certificates, to pay the amount due on the certificates to whomsoever the court may decide to be the owner of them. Since George E. Hendrick is the only contesting defendant, he will be referred to, for the sake of brevity, as the defendant.

Geo. R. Hendrick moved to Forest Grove, Oregon, in 1910; but he left that place and went to Smith Center, Kansas, in about 1916. At some time, presumably prior to his departure for Kansas, Geo. R. Hendrick deposited moneys in the Forest Grove National Bank and received therefor time certificates of deposit. From the time of his departure from Oregon in 1916, until the date of his death, Geo. R. Hendrick had moneys on deposit with the Forest Grove National Bank and these moneys are represented by time certificates of deposit issued to him. In 1917 he held several time certificates of deposit, including three certificates for $1,000 each. According to a letter written on April 2, 1917, by the decedent to the Forest Grove National Bank he sold three certificates, and the First National Bank of Smith Center "has got" three specified certificates "to collect." Certificates not sold or collected were renewed as they matured. The process of renewal involved the surrender and cancellation of the old certificates for the principal sums and the payment of interest due on the matured certificates.

The last renewals made by the bank were on Oc-

tober 8, 1919. The decedent then mailed from Smith
Center, Kansas, two one thousand dollar certificates
with directions to the bank to send him a draft for
the interest due on the matured certificates and to
issue new certificates for the principal sums. The
bank complied with the directions and, under date
of October 8, 1919, issued two time certificates of
deposit for $1,000 each, payable six months after
date to Geo. R. Hendrick or order with interest at
the rate of three per cent per annum. The bank
mailed these two certificates to the decedent at Smith
Center, Kansas. The decedent on October 13, 1919,
sent by registered mail to the defendant George E.
Hendrick at Boardman, Oregon, where the latter
then resided, a letter reading as follows:

"Smith Center, Kansas.
"Dear Son will send you two deposit checks you
will keep safely for me in case I come to need any
part or all of them & if I never need them they are
all yours when I am done with them.
"Your Pa Geo. R. Hendrick."

This letter was written with pen and ink. In the
upper right-hand corner of the letter appears the
word "three" written with pen and ink. Above the
word "three" appears the word "Two" written with
a lead pencil. Within the area covered by the word
"three" is also the word "two" written with a lead
pencil. However, as we understand the record, it is
admitted that only two certificates accompanied the
letter. The letter itself is not dated, but the envelope
is postmarked Oct. 13, 1919. The defendant re-
ceived the letter, and inclosed with it were the two
certificates of deposit which on October 8, 1919, the
Forest Grove National Bank had issued and mailed
to the decedent. When received by the defendant
each certificate bore the indorsement: "Geo. R. Hen-

drick'' in the handwriting of the decedent. According to the pleadings, Geo. R. Hendrick died intestate at Smith Center on December 21, 1919, leaving as his only heirs at law the defendant George E. Hendrick, a son, and William F. Hendrick, a son and a resident of Smith Center, Kansas, and Clarie M. Tobias, a daughter.

The complaint is framed on the theory that the defendant received the certificates ''under the conditions set forth in the letter * * and not otherwise,'' and that the transaction constituted at the most a mere bailment; and that, therefore, the plaintiff as the representative of the estate of the decedent, is entitled to the possession of the certificates and to the moneys due on them.

The amended answer was drawn upon the theory that the decedent sent the certificates to the defendant

''with instructions to said Geo. E. Hendrick to hold and keep said certificates, and the fund of money represented thereby, in trust for said G. R. Hendrick for and during his natural life, and that at the termination thereof, the legal title to said certificates and the funds represented thereby, or balance thereof, should be and become vested absolute in said Geo. E. Hendrick: * *

''That it was the intent, purpose, will and desire of said G. R. Hendrick to make a gift in trust during his life, or a voluntary settlement, of the said certificates and the funds represented thereby in favor of the defendant Geo. E. Hendrick, and that by delivery of said certificates, indorsed in blank, as aforesaid, he did so.''

REVERSED.    REHEARING DENIED.

For appellant there was a brief over the name of *Messrs. Flegel, Reynolds, Flegel & Smith,* with an oral argument by *Mr. John W. Reynolds.*

For respondent there was a brief and oral argument by *Mrs. Mauch L. Langley* and *Mr. Lotus L. Langley*.

For the respondent, Forest Grove National Bank, there was a brief and oral argument by *Mr. E. B. Tongue*.

HARRIS, J.—We understand from the plaintiff's printed brief that the trial court concluded that the letter of October 13th effected nothing more than a bailment. The plaintiff contends that the transaction, at the most, amounted to a bailment, and that therefore upon the death of Geo. R. Hendrick, the owner, the certificates passed to the administrator of his estate, with the result that the moneys due on the certificates must be paid to the administrator and by him be distributed as property of the estate. The defendant asserts in his printed brief, although he does not attempt to support the assertion with argument, that there is sufficient evidence in the record to warrant the conclusion that the transaction constituted a gift *causa mortis*. However, the defendant does argue that the transaction was one where the decedent transferred the certificates to the defendant as trustee, reserving to the decedent a life estate under terms which entitled him to use a part or all of the funds in case he needed a part or all during his life, with remainder over to the defendant. The printed brief submitted by the defendant is confined to arguments advanced in support of this contention; and if this position taken by the defendant is correct, the legal and equitable estates were merged in him and he became the absolute owner of the certificates immediately upon the death of his father.

Discussion of the legal right of the parties will be made clearer if we first direct attention to the evidence; but before considering any of the evidence we must dispose of an objection made by the plaintiff. In addition to the letter of October 13, 1919, the defendant, over the objection of the plaintiff, offered other evidence, consisting principally of letters and evidence of their contents, which the defendant claims tends to show that it was the intent of the decedent ''to make a gift in trust during his life, or a voluntary settlement, * * in favor of the defendant.'' The plaintiff, in his printed brief, contends that by reason of the form of the allegations in the amended answer, the letter of October 13, 1919, is the only evidence

''to be considered by the court in adjudicating the legal rights of the parties,'' although the plaintiff concedes that ''if defendant had alleged what he claimed as establishing the gift in trust, he could doubtlessly introduce in evidence anything that would tend to establish the allegation.''

The plaintiff directed attention to the form of the allegation in the amended answer, for when objecting he stated:

''The point that I make is that * * the answer specifically states that those instructions were given us on October 13, 1920 [1919],''

and that evidence of any other instructions was incompetent and not pertinent to the issues.

1. The owner of personal property can, when dealing with it, create a trust either by spoken words or by a writing: *Cooper* v. *Thomason*, 30 Or. 161, 171 (45 Pac. 296); *Martin* v. *Martin*, 43 Or. 119, 123 (72 Pac. 639). The decedent, therefore, could have orally declared a lawful trust, or he could have done so in writing.

2. Of course, if a writing is employed its terms cannot be varied by parol testimony. However, in the instant case it is not claimed that evidence of oral and written declarations made prior to October 13, 1919, varies or contradicts the letter of October 13th; but the contention is that because of the form of the allegation in the amended answer no evidence of instructions can be considered except the letter of October 13th.

The complaint contains a copy of the letter of October 13th accompanied with an allegation that the two certificates were inclosed with the letter. The amended answer admits the writing of the letter of the 13th and its receipt by the defendant, and that the two certificates were inclosed with the letter. The amended answer also affirmatively alleges that on the 13th day of October, 1919, the decedent forwarded two certificates "with instructions to said Geo. E. Hendrick to hold and keep said certificates." This language is plain and unambiguous. The clear meaning of the allegation in that the certificates were on October 13, 1919, forwarded by registered mail, and "with" them instructions were forwarded. It is conceded that no instructions were "with" the two certificates when received by the defendant, except the letter of October 13th. This letter does in truth contain instructions; and, hence, these instructions, whatever they may be, must govern.

3. Where the language of a writing is clear and unambiguous extrinsic evidence is not admissible upon the ground of aiding the construction. But where the language of a written instrument is ambiguous or equivocal or reasonably susceptible of conflicting interpretations the Code permits evidence of the circumstances under which the writing was made, in-

cluding the situation of the subject of the instrument, and of the parties to it, so that the court can be placed in the position of him whose language is to be interpreted: Section 717, Or. L.; *Fisk* v. *Henarie*, 13 Or. 156, 171 (9 Pac. 322); *Jasper* v. *Jasper*, 17 Or. 590, 594 (22 Pac. 152); *Salem King's Products Co.* v. *Ramp*, 100 Or. 329, 356 (196 Pac. 401).

4. The language of the letter of October 13th is not, when standing alone, free from ambiguity. It is reasonable susceptible to more than one construction. Indeed, the plaintiff with undoubted sincerity argues that the letter has one meaning, while the defendant with equal sincerity contends for a different meaning. The decedent, all will no doubt agree, entertained an intention of some sort concerning the disposition of the certificates; and, hence, we may assume that he wrote the letter of October 13th for the purpose of giving expression to that intention. The instructions contained in this letter cannot be varied or contradicted by parol; nor, indeed, can they be varied or contradicted by prior letters. To the extent that the letter of October 13th contains instructions it must control, regardless of any questions of pleading. In short, the defendant pleads that the letter of October 13th constituted the instructions which accompanied the certificates; and furthermore, aside from any question of pleading, the letter was in truth a letter of instructions; and, hence, in any aspect of the case, this letter, to the extent that it contains instructions, must control. However, the court is permitted to look to prior letters written and oral statements made by the decedent, and to acts done by him, for the purpose of ascertaining the meaning of the words used by the decedent in the letter of October 13th.

Geo. R. Hendrick lived with his son George E. Hendrick in Oregon for a time before going to Kansas. The record does not definitely show whether the defendant lived with George E. Hendrick during the whole or only part of the period of his residence in Oregon. The only evidence upon that subject is the testimony of the defendant, who said: "He lived at my home up and until that time." We infer that the decedent lived with his son William F. Hendrick from the time he moved to Smith Center until the date of his death.

On April 2, 1917, the decedent wrote to the Forest Grove National Bank explaining that on that morning he had taken from his "safe box" in the First National Bank of Smith Center three one thousand dollar certificates, which had been issued by the Forest Grove National Bank, and that on his way to the postoffice he dropped them on the street and lost them and

"I wired to you that I had lost them & don't pay them I had signed two of them to W. F. Hendrick & one to G. E. Hendrick & was preparing them to send to you for extension but they slipped through my fingers perhaps some one will find them all right but refuse to pay them to anybody."

Eight days later, on April 10, 1917, he wrote to the Forest Grove National Bank as follows:

"Smith Center Kans 4–10–17
"Forest Grove Nat Bank.
    "Forest Grove
    "Dear Sirs your reply received this morning would say that I want to leave that 3000 there again six months & the Interest too but want you to understand that in case of my Decease $1020 and Int will be paid to George E. Hendrick my oldest Son & the $2040 & Int will be paid to Wm. Hendrick my youngest son.

"I am satisfied without a Doubt that they are no danger of coming to light again if you know anything of these Kansas winds you would say they are nearly annihilated in the future so leave it as it is for the next six months to come & oblige as ever

"GEO. R. HENDRICK.

"P. S.    It might be well to file this away so as to carry out my wishes in the future

"GEO. R. HENDRICK."

Beneath the postscript he further states that the three lost certificates were given on October 7, 1916, and were due on April 7, 1917.

The decedent executed a deed, dated June 14, 1917, and recorded February 26, 1919, conveying to William F. Hendrick four lots in Smith Center for an expressed consideration of "Twenty Dollars and other valuable considerations." The deed contains the following language:

"To be in force and effect after the decease of the party of the first part [the grantor]."

There is no evidence concerning the deed except a certified copy of it.    No information is given about the reasons for the execution of the deed or the circumstances attending the transaction.    In short, we know nothing whatever of the conveyance except the bare fact that the deed was executed and the bare fact that it was recorded.    The record is utterly devoid of any evidence concerning the value of the lots described in the deed.

The defendant lived in Elgin, Oregon, before moving to Boardman, Oregon, and, although the evidence is indefinite, we infer from the record that he moved to Boardman early in September, 1919.    The defendant testified that he received some letters from his father soon after he moved to Boardman but that these letters, except one dated September 27, 1919,

and the letter of October 13th had been destroyed by fire when a building burned down, and for that reason he was compelled to depend upon his recollection of the contents of the destroyed letters. According to the testimony of the defendant, when he moved from Elgin "I sent my father my address," but his father evidently lost the letter, for the latter wrote "to the postmaster at Elgin to know what my address was." As we understand the testimony of the defendant, he claims that as soon as his father heard from the Elgin postmaster his father

"wrote to me and he had some important business with me, and he wanted my correct address; and I answered his letter and this October 13th letter followed."

When testifying as a witness, the defendant stated that during the latter months of his father's life his father had communicated to him "of what his intent towards the distribution of his property was"; and, when asked to state the "general tenor" of those communications, the defendant answered:

"He said in one letter, and he had often told me when he lived with me, he wanted to hang on to his money until he knew that he was done with it; I could rest myself assured that each one would get what was coming to them and he did not want any grumbling about it; and he wanted us to be satisfied, and hoped there would be no reason to hire a lawyer, and hoped we would have respect enough for him for that."

When asked to state his recollection of the contents of the destroyed letters the defendant testified:

"He said in one letter that he had been to a sanitarium and he thought it was a pretty expensive hotel, and he had a little money left and he wanted to get rid of it; and he said he had plenty of money on hand besides these things for present needs; he

said I might or I might not need this, but if I do I will call on you; you take good care of this and keep yourself out of debt.''

The witness explained that the words ''these'' and ''this'' used by his father ''referred to the money that he was going to send.'' The defendant also testified:

''There was about four letters there, through all the instructions there was, and they led up to the sending of those certificates to me; and the sum and substance of it was that he anticipated his demise; and in one letter he said he wanted me to take this and be satisfied with it, and he hoped that there would be no use for any lawyers, or something like that; that we would respect what he had done.''

Omitting the mere formal parts, the letter of September 27, 1919, reads as follows:

''Smith Center Kans Sep 27. 19

''Son & family I got your letter this morning & I will will hasten to tell you what I want have some money coming due now soon and as you need some will send to you I am in not need so much at present & will send to you You can get money on it as soon as you get it or can send & get it yourself but when you get it you may pay up all the interest and the interest due on this up to Jan 1 1920 & that will be all I may need I do not want much money lying around here any more to slipery stuff The all the interest will be enoug to last me a long time & I have some papers I want you to care for me in case I may need them & if I don't need them they will be yours sometime My eye sight is not as good as once I don't keep the line very good this is all this time Write soon

''As Ever GEO R HENDRICK

''Best Wishes for All''

One of the burned letters that was received prior to the letter of September 27, 1919, and the other burned letter was received by the defendant subsequent to September 27th, but prior to October 13th.

The decedent was about eighty-two years of age at the time of his death; and, although the defendant testified that his father had cancer, there was no evidence as to whether or not cancer was the cause of his death. There is no evidence showing the value of the estate left by the decedent. The record is devoid of any evidence showing the disposition made of any of the property owned by the decedent at or shortly prior to his death except the deed to William and the contested certificates. We do not know whether the daughter received any of her father's property. In short, the foregoing narrative contains substantially all of the competent evidence found in the record.

If the delivery of the certificates constituted a gift, or if the certificates were delivered to the defendant to be held by him in trust under the terms pleaded by the defendant, the certificates now belong to the defendant and the estate of the decedent does not own any interest in them or in the moneys due on them. If, however, the defendant held the certificates as a mere agent, or as a bailee, the estate and not the defendant is now the owner of them. *Hillman* v. *Young,* 64 Or. 73, 84 (127 Pac. 793, 129 Pac. 124). If the decedent intended to do nothing more than to provide for a testamentary disposition of the certificates, then the estate must be held to be the owner of them, because the attempt to execute that intent was futile.

5. In order to effect a gift *inter vivos* the donor must divest himself of the thing given and transmit the title to it to the donee gratuitously. The gift operates immediately and irrevocably; it is a gift executed; no contingency of death or otherwise is needed to give it effect.

6. A gift *inter vivos* goes into immediate and absolute effect. A delivery accompanied with a condition which constitutes a condition of delivery or of title prevents the consummation of a gift *inter vivos*. A delivery subject to reclamation of the property by the donor at any time prior to his death, or where control or power over the property vests in the donee only after the death of the donor, does not amount to a gift *inter vivos: Waite* v. *Gubbe,* 43 Or. 406, 410 (73 Pac. 206, 99 Am. St. Rep. 764); *Grignon* v. *Shope,* 100 Or. 611, 616 (197 Pac. 317, 198 Pac. 520); 20 Cyc. 1192, 1209–1211; 12 R. C. L. 931, 934. To constitute a gift *inter vivos* there must be not only a donative intention but also a complete stripping of the donor of dominion or control over the thing given: *Stevenson* v. *Earl,* 65 N. J. Eq. 721 (55 Atl. 1091, 103 Am. St. Rep. 790, 1 Ann. Cas. 49).

7. A gift *causa mortis* is a gift of personal property made under apprehension of the approach of death from some existing disease or other impending peril, with the implied condition that it shall take effect absolutely only upon the death of the donor caused by the disease from which he is then suffering or the peril which is then impending.

8. A gift *causa mortis* is made subject to three con ditions implied by law, the occurrence of any one of which will defeat the gift: (1) The recovery of the donor from the sickness or his delivery from the peril; (2) revocation by the donor before his death; (3) death of the donee before the death of the donor: *Hillman* v. *Young,* 64 Or. 73, 82 (127 Pac. 793, 129 Pac. 124); *Grignon* v. *Shope,* 100 Or. 611, 617 (197 Pac. 317, 198 Pac. 520); 20 Cyc. 1228, 1230.

9. Gifts *inter vivos* and gifts *causa mortis* have points of resemblance, as well as distinguishing

features. One point of resemblance is found in the circumstance that in both classes of gifts the title is transferred and vested in the donee at once; but at the same time a distinguishing feature is found in the fact that in the case of a gift *inter vivos* the title is not only transferred and vested in the donee at once but the gift is immediately completed and is absolute and irrevocable, while in the case of a gift *causa mortis*, although there is a present transfer of title, the transfer is subject to be defeated by the happening of any one of the conditions implied by the law: *Deneff* v. *Helms,* 42 Or. 161, 164 (70 Pac. 390). The donor must part with all dominion over the property so that no further act is required to vest the title perfectly in the donee, if the property be not reclaimed by the donor during his life: *Liebe* v. *Battmann,* 33 Or. 241, 245 (54 Pac. 179, 72 Am. St. Rep. 705); *Hillman* v. *Young,* 64 Or. 73 (127 Pac. 793, 129 Pac. 124); 20 Cyc. 1232; 12 R. C. L. 931.

10. Obviously, the certificates were not delivered as a gift *inter vivos;* nor will the record sustain a holding that they were delivered as a gift *causa mortis.*

11. There is no competent evidence in the record concerning the sickness and death of Geo. R. Hendrick, except the admission in the pleadings that he died on December 21, 1919, and the bald statement of the defendant that his father "had cancer." There is no competent evidence showing, or even intimating, when the cancer made its appearance. It is true that the record contains a letter written by William F. Hendrick to the defendant, under date of December 28, 1919, containing statements about the condition of his father. The plaintiff properly objected to the reception of this letter, for it was not competent under any rule of evidence recognized by

the law. An officer of the Forest Grove National
Bank and the defendant were the only persons who
testified. William F. Hendrick is not a party, al-
though he is interested in the litigation; and so is
the sister interested; but her interests cannot be con-
trolled by a letter written by one of her brothers.
Nor, when determining the issue between the plain-
tiff and the defendant, can we consider the contents
of the letter written by William F. Hendrick to the
Forest Grove National Bank under date of January
12, 1920, even though it be assumed, without decid-
ing, that the letter is competent to be considered
in determining the rights and duties of the bank.
Eliminating the incompetent letters written by Wil-
liam F. Hendrick, nothing remains except the ad-
mission that the father died, the oral testimony of
the defendant, and the original answer verified by
the defendant. All of the testimony of the defend-
ant relating to the condition of the father at the
time of the delivery of the certificates is summed
up in the single statement: "He was a sound and
healthy man, excepting that he had cancer." The
original answer was drawn upon the theory that the
certificates were delivered as a gift *causa mortis,*
and in that pleading, among other allegations, is the
following:

"That on or about October 13, 1919, Geo. R. Hen-
drick was suffering from diseases of the heart and
suffocating contractions of the lower chest, with
peculiarly intense pain and suffering, and in fail-
ing health."

There is no suggestion of a trust in this pleading.
However, the amended answer is based upon the
ground of a trust, without any suggestion of a gift
*causa mortis,* unless it can be said that the allega-

tion on October 13, 1919, Geo. R. Hendrick was eighty-two years of age and "in ill health and suffering from diseases of the heart," contains such a suggestion. In brief, although the defendant has in both answers relied upon ownership as a defense, he has offered different props to sustain his plea of ownership, for in the original answer the doctrine of gift *causa mortis* was his prop, while in the amended answer he used the theory of a trust as his prop, and abandoned the notion of a gift *causa mortis*. The amended answer is based upon the idea of a trust only: *Hillman* v. *Young,* 64 Or. 73, 86 (127 Pac. 793, 129 Pac. 124). On the record as it is presented to us, the certificates were delivered to the defendant either as an agent or bailee, or as a trustee.

The evidence shows beyond any reasonable doubt that the decedent intended that the certificates, or at least the unexpended portion of the funds which the certificates represented, should upon his death become the absolute property of the defendant. The question for decision is: Can the law give effect to that intention? If the father delivered the certificates to the son as his agent, or as a mere bailee, and, without absolutely surrendering dominion over them, he gave directions that the son should upon his death retain them as his property, then the transaction was a futile attempt to make a testamentary disposition of property: 20 Cyc. 1233; *Deneff* v. *Helms,* 42 Or. 161, 165 (70 Pac. 390); *Hillman* v. *Young,* 64 Or. 73, 84 (127 Pac. 793, 129 Pac. 124). On the other hand, if the certificates were delivered under a trust, the transaction was not testamentary, and, therefore, the law will give effect to it.

12. The owner of personal property may voluntarily create a trust in it by delivering the property

and transferring the title to a trustee to be held for the benefit of another. It has been said that—

"A voluntary trust is an equitable gift, and, like a legal gift *inter vivos,* must be complete. A declaration of trust as effectively passes the equitable title of the fund to the *cestui,* as a gift *inter vivos* passes the legal title to the donee. The distinction between them is of a technical nature. In a trust, the real title vests in the donee, but the legal title, perhaps carrying control of the property, may be placed elsewhere; while, in a gift, both the real and legal title instantly fall to the donee." *Bath Savings Inst.* v. *Hathorn,* 88 Me. 122 (33 Atl. 836, 51 Am. St. Rep. 382, 32 L. R. A. 377) ; 26 R. C. L. 1192.

13. The important difference between a gift *inter vivos* and a voluntary trust is that in the case of a gift the thing itself, together with the legal and equitable title to it, passes to the donee, while in the case of a voluntary trust, the actual, beneficial or equitable title passes to the *cestui que trust,* while the legal title is retained by the person creating the trust to be held by him for the purposes of the trust, or is by the settlor transferred to another to hold for the purposes of the trust: *Norway Savings Bank* v. *Merriam,* 88 Me. 146.

14. A mere promise, without consideration, to declare a trust in the future avails nothing, but to be effective a voluntary trust must so operate as presently to transfer an interest in the thing. The legal estate must be separated from the beneficial enjoyment, in order to produce a trust; and the moment the two estates merge in the same person, the trust ends: 26 R. C. L. 1186.

15. A trust implies two estates,—one legal, and the other equitable; it also implies that the legal title is held by one person, the trustee, while another person, the *cestui que trust,* has the beneficial

interest: *Hawkins* v. *Donnerberg,* 40 Or. 97, 107 (66 Pac. 691, 908).

16. Personal property may be limited by way of remainder after a life interest created at the same time: *Innes* v. *Potter,* 130 Minn. 320 (153 N. W. 604, 3 A. L. R. 896); 21 C. J. 1038, 1044.

17. A trust may be created for the benefit of the settlor during his life with remainder to other persons: 39 Cyc. 36; *Kelley* v. *Snow,* 185 Mass. 288 (70 N. E. 89); *Lewis* v. *Curnutt,* 130 Iowa, 423 (106 N. W. 914).

18. The power of revocation may be reserved by the creator of the trust, and if not exercised by him during his lifetime the validity of the trust remains unaffected. Reservation of the right of revocation does not affect the legal title of the property, for that passes and remains vested for the purposes of the trust, notwithstanding the existence of a right to revoke it: *Stone* v. *Hackett,* 12 Gray (Mass.), 227; *Witherington* v. *Herring,* 140 N. C. 495 (53 S. E. 303, 6 Ann. Cas. 188); *Dickerson's Appeal,* 115 Pa. St. 198 (8 Atl. 64, 2 Am. St. Rep. 547); *Lines* v. *Lines,* 142 Pa. St. 149 (21 Atl. 809, 24 Am. St. Rep. 487). If in the instant case a trust was created, it will be seen from an inspection of the letter of October 13th that the settlor did not reserve the right of revocation.

19. At first blush, it may appear that reservation by the creator of the trust of the right to call upon the principal of the trust funds "in case I come to need any part or all of them" and the exercise of that right operate as a revocation, but upon careful analysis it will be seen that the result is not a revocation of the trust but is a performance of it: *Lovett* v. *Farnham,* 169 Mass. 1 (47 N. E. 246); *Hackett* v. *Moxley,* 63 Vt. 71 (25 Atl. 898); *Hellman* v. *Mc-*

*Williams,* 70 Cal. 449 (11 Pac. 659); *Davis* v. *Ney,* 125 Mass. 590 (28 Am. Rep. 272); *Rosenburg* v. *Rosenburg,* 40 Hun (N. Y.), 91. Indeed it has been held not only that the reservation of the power of revocation or modification but also that an express provision that the trustee shall hold the fund subject to the direction and control of the settlor does not invalidate a trust of personal property: *Van Cott* v. *Prentice,* 104 N. Y. 45 (10 N. E. 257); *Brown* v. *Spohr,* 87 App. Div. 522 (84 N. Y. Supp. 995).

20. It has been held that it is no objection to the validity of a trust that the trustee is named as one of the beneficiaries: 39 Cyc. 36. One of two or more *cestuis que trust* is not incapable of taking in trust for himself and the others: 1 Perry on Trusts (6 ed.), § 59; *Summers* v. *Higley,* 191 Ill. 193 (60 N. E. 969); *Burbach* v. *Burbach,* 217 Ill. 547 (75 N. E. 519). See, also, *Rosenburg* v. *Rosenburg,* 40 Hun (N. Y.), 91.

21. The difference between a will and a trust is that a will operates only from the moment of death, while a trust operates *in praesenti,* to a certain extent: *Nichols* v. *Emery,* 109 Cal. 323 (41 Pac. 1039, 50 Am. St. Rep. 43); *Hiserodt* v. *Hamlett,* 74 Miss. 37 (20 South. 143); *Kelly* v. *Parker,* 181 Ill. 49 (54 N. E. 615); *Lewis* v. *Curnutt,* 130 Iowa, 423 (106 N. W. 914); *Basket* v. *Hassell,* 107 U. S. 602 (27 L. Ed. 500, 2 Sup. Ct. Rep. 415, see, also, Rose's U. S. Notes).

22. It is competent for the settlor to make his death the event upon the happening of which the estate in interest, previously vested *in praesenti* but to be enjoyed *in futuro* is to come into possession. Death is the time when the trust, already perfectly constituted, is, as to the estate previously vested in interest by it in the trustee, for the beneficiary, to come into possession of the beneficiary to be en-

joyed: *Hiserodt* v. *Hamlett,* 74 Miss. 37 (20 South. 143).

23. The fact that the enjoyment of the estate is postponed to a future date does not negative the idea that a present interest is created in favor of the party or parties for whose benefit the trust is declared. A present interest is transferred, but the enjoyment of that interest is deferred: *Lewis* v. *Curnutt,* 130 Iowa, 423 (106 N. W. 914).

24. The fact that the instrument postpones the enjoyment of the subject matter until the death of the settlor is not decisive that the instrument is testamentary in character: *Innes* v. *Potter,* 130 Minn. 320 (153 N. W. 604, 3 A. L. R. 896); *Brown* v. *Mercantile Trust Co.,* 87 Md. 377 (40 Atl. 256.)

25. Indeed the test for determining whether a writing has effected a trust or is testamentary in character is whether the maker intended the instrument to have any effect until after his death, or whether he intended to transfer some present interest: *Innes* v. *Potter,* 130 Minn. 320 (153 N. W. 604, 3 A. L. R. 896); *Lewis* v. *Curnutt,* 130 Iowa, 423 (106 N. W. 914).

If, therefore, the father intended to pass the legal title to the son, as trustee, reserving, however, a life estate in the certificates and funds which the certificates represented with the right to call for a part or all of the funds "in case I come to need any part or all of them," with remainder over to the son as absolute owner, then the transaction was a valid trust and will be given effect.

26. Whether the father intended that the delivery of the certificates should operate as a testamentary disposition with the son holding as a mere agent or bailee during the life of the father, or, whether he intended to present transfer under a trust is a ques-

tion of fact to be determined from a consideration of all the evidence: *Grant Trust etc. Co.* v. *Tucker,* 49 Ind. App. 345 (196 N. E. 487).

27. No particular form of words is required to create a trust, and whether one exists is to be ascertained from the intention of the party as manifested by the words used and the surrounding circumstances. The intent of a settlor in the creation of a trust is what the court looks to, and not to any particular form of words. In determining whether or not a trust has been created, the court will take into consideration the situation and relations of the parties, the character of the property and the purpose which the settlor had in view in making the declaration.

28. The use of the words "trust" or "trustee" is not essential; but it is sufficient if the language used shows that the settlor intended to create a trust. However, the intention must be clearly proved; the language used must be such as to disclose with certainty an intention to create a trust. There must be either explicit language expressing the trust or circumstances which show with reasonable certainty that a trust was intended to be created. The evidence must be clear, explicit and convincing not only as to the existence of the trust but also as to its terms and conditions: 1 Perry on Trusts (6 ed.), § 82; 39 Cyc. 58, 84; 26 R. C. L. 1180; *Lewis* v. *Curnutt,* 130 Iowa, 423 (106 N. W. 914); *Norway Savings Bank* v. *Merriam,* 88 Me. 146 (33 Atl. 840); *Clark* v. *Callahan,* 105 Md. 600 (66 Atl. 618, 12 Ann. Cas. 162, 10 L. R. A. (N. S.) 616; *Coyne* v. *Supreme Conclave,* 106 Md. 54 (66 Atl. 704, 14 Ann. Cas. 870); *Witherington* v. *Herring,* 140 N. C. 495 (53 S. E. 303, 6 Ann. Cas. 188); *Nicklas* v. *Parker,* 71 N. J. Eq. 777 (61 Atl. 267, 71 Atl. 1135, 14 Ann. Cas. 921);

*Nichols* v. *Emery,* 109 Cal. 323 (41 Pac. 1089, 50 Am. St. Rep. 43). Although the letter of October 13th standing alone is reasonably susceptible to more than one construction, yet if, when read in the light of the surrounding circumstances, the language of that letter becomes clear, and ambiguity is dissolved, then it can be said that the defendant has proved a trust with the degree of certainty required by the law.

29. If we turn back to 1917 we find the father manifesting an intention that upon his death the defendant and William F. Hendrick shall each become the absolute owner of specified property, but we also find the father retaining possession of such property. We learn from the letter of April 2, 1917, written by the father to the Forest Grove National Bank, that he "had signed two" of the three one thousand dollar certificates, which had been lost, "to W. F. Hendrick and one to G. E. Hendrick," and that he lost the certificates when taking them from his "safe box" to the postoffice to send to the Forest Grove National Bank for renewal; and we learn from the letter of April 10, 1917, that the three lost certificates became due April 7, 1917. In brief, we learn that the father wished that, when he died, William F. Hendrick should become the owner of two certificates, and that the defendant should become the owner of one certificate; but we also find the father retaining possession and absolute dominion over them. Notwithstanding the fact that he had indorsed two certificates to one son and one certificate to the other son, he instructs the bank to "refuse to pay them to anybody"; and notwithstanding the fact that he had thus indorsed the three certificates, he was on his way to the postoffice to mail them

to the bank so that the bank could renew them by issuing new certificates to him, not to his two sons. At no time in 1917 did the father entertain any idea of surrendering the possession of the certificates to either son. If the father had died in 1917 the certificates would have passed to his estate, because his acts did not constitute a gift *inter vivos,* nor a gift *causa mortis,* nor a trust; but they amounted to nothing more than a futile attempt to make a testamentary disposition of them. The fact that the deed was dated June 14, 1917, and was not recorded until February 26, 1919, furnishes some ground for the inference that at least some control, if not all control, over that instrument was retained until 1919. Although the record gives us but little information about the estate of the decedent, or its value, or of the disposition made of it, we do know from the two letters of April, 1917, to the Forest Grove National Bank that Geo. R. Hendrick then owned six time certificates of deposit, besides three which he has sold. Three of the six certificates still owned by him had been turned over to the First National Bank of Smith Center "to collect," and the remaining three were those which he lost. Presumably the two certificates now in controversy are renewals of two of the three certificates which were lost in 1917, and presumably the father retained uninterrupted possession of at least two certificates until October 13, 1919, when he sent two certificates to the defendant. It is not necessary to attempt to ascertain whether the father intended to send three certificates when he wrote the letter of October 13th, although it is significant that the letter is not dated and that it was written with pen and ink and the word "two" was twice written with a lead pencil

and not with ink, thus indicating that the letter was written at one time in anticipation of the mailing of the certificates and the change from "three" to "two" was made at a later time.

Coming to 1919 we find the father still manifesting an intention concerning the disposition of his property, but we find him expressing that intention in quite a different manner. He does not carefully and deliberately retain possession, but upon the contrary he designedly and deliberately relinquishes possession. The deed is recorded. At least two of the certificates mature on October 8, 1919. The father knows that these certificates will mature on that date, and, anticipating the maturity of the certificates and their renewal, he writes to the defendant. Even if we disregard the two letters which were destroyed by fire, we know from the letter of September 27, 1919, that the father plans to relinquish possession of the certificates and to deliver them to the defendant. The only money, so far as is disclosed by the record, "coming to me now soon" is the money due October 8, 1919, on the certificates; and it is fair to infer that this is the money of which the father speaks when he says:

"And as you will need some will send to you." Obviously, the father plans to send, not cash but paper representing money, for he says: "You can get money on it as soon as you get it or you can send & get it yourself." Manifestly, the "it" upon which "you can get money" carries interest, for the father says to the defendant: "When you get it you may pay up all the interest and the interest due on this up to Jan 1 1920," and he then explains that the interest "will be all I may need."

There is nothing in the record showing that the father ever sent any money or any representative of

money, except the two certificates.  After explaining that "the Interest will be enough to last me a long time" the father says:

"I have some papers I want you to care for me in case I may need them & if I don't need them they will be yours sometime."

Substantially the same language as that last quoted appears in the letter of October 13th including the language about the contingency "in case I may need them." It is apparent that the writer of the letters of September 27th and October 13th was not a highly educated man accustomed to choose and use words with the discrimination of a trained writer; and yet when the letter of October 13th is read in the light of the attending and preceding circumstances his purpose becomes sufficiently clear.

The letter of October 13th is brief; naturally its very brevity suggests that it was written with reference to what has been written before. The letter of October 13th is the consummation of a purpose previously conceived and discussed. It must be remembered that the father did not merely deliver possession of the certificates; but he did everything necessary or appropriate to transfer ownership—he indorsed the instruments in blank, which is the most unrestricted form of indorsement: Section 7826, Or. L. With those indorsements the son could get money on "it" and, moreover, those were the only papers sent to the defendant upon which he could get money. Furthermore, the father did not write to the bank and notify it not to pay the certificates except upon his death. The injunction to "keep safely for me" was qualified by the words "in case I come to need any part or all of them"; and then follows the statement, "if I never need them they are all

[no longer partly yours] yours." If we take the two certificates alone with the indorsements on them we find possession and all the indicia of absolute ownership in the defendant. If we take the certificates in connection with the letter of October 13th, read in the light of attending and preceding circumstances, we have a transfer of title with no reservation whatever except the right to call upon the certificates "in case I come to need any part or all of them." Everything that was done in 1919, especially when considered in connection with what was done in 1917, indicates an intention to create a present interest in favor of the defendant: *Dickerson's Appeal,* 115 Pa. St. 198, 200 (8 Atl. 64, 2 Am. St. Rep. 547). We repeat that the letter of October 13th standing alone is susceptible to more than one construction; and hence it may be assumed that if the letter stood alone it could not be said that a trust was created. But the letter does not stand alone; for it was preceded and accompanied by explanatory circumstances, and when read in the light of those circumstances, the intention of the decedent becomes clear. Our conclusion is that the transaction was a trust, and, therefore, the defendant George E. Hendrick is entitled to the money due on the certificates. The bank shall not be required to pay interest after the date of the maturity of the certificates. The decree is reversed but without costs to any party in either court.

REVERSED. REHEARING DENIED.

BURNETT, C. J., and MCBRIDE and RAND, JJ., concur.