Argued February 24; affirmed April 4; rehearing denied
May 16, 1939

IN RE NORMAN'S ESTATE

# CHARLESTON v. FIRST NATIONAL BANK OF PORTLAND

(88 P. (2d) 977)

Department 2.

*J. O. Stearns, Sr., Roy F. Shields,* and *W. O. Sims,* all of Portland (J. O. Stearns, Sr., Roy F. Shields, and Sims & Sims, all of Portland, on the brief), for appellants.

*James G. Wilson* and *George B. Guthrie,* both of Portland (George B. Guthrie and Wilson & Reilly, all of Portland, on the brief), for respondent.

BAILEY, J. The question presented on this appeal is whether Warren Herbert Norman gave to his grandson, Warren Herbert Charleston, on September 12, 1930, a $10,000 United States fourth series Liberty Loan bond, with interest coupon for October 15, 1926, and all subsequent interest coupons attached. The circuit court found that such a gift was made and entered a decree in favor of the claimant and against the First National Bank of Portland, Oregon, administrator with the will annexed of the estate of Warren Herbert Norman, deceased, for the sum of $11,505.83, and in addition thereto ordered the administrator to deliver to the said claimant through his guardian *ad litem* five designated bonds of the par value of $1,000 each, with interest coupons attached, having an aggregate appraised value of approximately $5,000. From this decree the administrator and Alva May Norman and Clara Louise Baton, daughters of the decedent, who were permitted to intervene, have appealed.

Warren Herbert Norman died testate in the city of Portland on October 12, 1935, leaving an estate appraised at $100,098.14, consisting of: cash, $1,133.34; bonds, $17,409.68; stocks, $28,867; notes, $12,953.29; miscellaneous, $684.83; and real property, $39,050.

On September 12, 1930, the day on which the gift is alleged to have been made, Warren Herbert Norman, then seventy-two years of age, executed his last will and testament. His only heirs at law living then, and at the time of his death, were his three daughters, Hazel G. Charleston, Alva May Norman and Clara Louise Baton, aged respectively 43, 39 and 37 years at the time the will was probated, all residents and inhabitants of the city of Portland. No children were born to any of his daughters except Hazel Charleston, who had two

sons, Ralph Norman Charleston and Warren Herbert Charleston, the claimant, aged respectively nineteen and thirteen years at the time of the decedent's death.

By the terms of his will Mr. Norman devised to his daughter Alva May Norman his home place, consisting of four lots in Sunnyside addition to Portland, appraised at $2,400, and bequeathed to her all his household furniture and equipment and objects of art, appraised at $215.50. All the remainder of his estate he devised and bequeathed to Security Savings and Trust Company, a corporation of the state of Oregon, which was also named executor of the will, in trust for a period of two years immediately following the date of his death, with powers to manage, sell and dispose of his property. Upon the termination of that period, if all his daughters should then be living, the trustee was directed to distribute the remainder of the testator's estate, after paying his debts, costs of administration and other charges, to the three daughters, share and share alike. Provision was made for distribution of the share of any one of the daughters who might die during the life of the trust.

This will was admitted to probate October 25, 1935, and the First National Bank, with which the Security Savings and Trust Company had been merged, was appointed by the probate court as administrator with the will annexed of the estate of Warren Herbert Norman, deceased.

The first notice to creditors given by the administrator was published October 26, 1935. On April 17, 1936, Warren Herbert Charleston, by his father and guardian *ad litem*, Ralph L. Charleston, presented to the administrator of the estate a claim against the estate "for the avails or proceeds of certain securi-

ties'' which were alleged to have been given by the decedent to Warren Herbert Charleston. Among other things, the claim alleges:

''that said securities comprised ten thousand dollars ($10,000) par value of United States Liberty bonds of the so-called fourth issue, due October 15, 1932-1938, bearing interest at the rate of 4½%, which said bonds were set apart during the year 1926 by the said Warren H. Norman, now deceased, and placed in a container or envelope endorsed in the handwriting of said decedent indicating that the same were designed and intended and set apart by said decedent in the year of 1926 for the education of said Warren H. Charleston; and further, and on or about the 12th day of September, 1930, said Warren H. Norman did deliver the same unto the undersigned, Ralph L. Charleston, father of said Warren H. Charleston, with instructions and advice to the effect that the undersigned, Ralph L. Charleston, was to hold the same for the education and benefit of said Warren H. Charleston; that thereby said gift was completed; that at the last date mentioned decedent, Warren H. Norman, did display unto the undersigned, Ralph L. Charleston, the specific securities in question, together with coupons thereto attached, which said coupons dated from the year of 1926, and said Warren H. Norman did then and there declared that said bonds, and all coupons attached, were by him intended to be a complete and separate gift on the part of said Warren H. Norman unto said Warren H. Charleston''.

It is further stated in the claim presented to the administrator that some time after September 12, 1930, ''and for the accommodation of all parties concerned and the safe keeping of said securities, the container and envelope within which said bonds were enclosed was taken in charge by said Warren H. Norman,'' and was held, according to the understanding of the guardian *ad litem*, by said Norman until shortly before his

death; that the said bonds were called for payment as of October 15, 1935; and that Norman, shortly before the call date mentioned, had ordered the bonds sold and the proceeds invested in other bonds selected by him.

This claim was rejected by the administrator, and thereafter, accompanied by the administrator's notice of disallowance, it was filed in the probate court. Later the claimant asked that his claim be heard and determined by the court in a summary manner, whereupon the administrator filed a motion to require the claimant to identify the particular securities by him claimed, by setting forth the official serial numbers thereof and the par value of such securities and each of them, as well as the date, time and place when and where the said securities were redelivered to Warren Herbert Norman by Ralph L. Charleston. This request was resisted by the claimant, and before the motion was heard the claimant filed a petiton for an inspection of books, documents and papers in the possession of the administrator, in which petition it was also set forth that the administrator had served a motion to require the plaintiff to make his claim more definite and certain, and "that in order to comply with said motion, should the court so order, and in order to prepare for trial of said claim, it is necessary that such inspection as herein requested be given." The motion to make more definite and certain was denied, and the petition for inspection was allowed.

The hearing of this claim was assigned by the judge of the probate department to another judge of the circuit court for Multnomah county. Prior to that time, however, Alva May Norman and Clara Louise Baton were granted permission to intervene and oppose the claim. After hearing testimony in support of

and in opposition to the claim the judge to whom the cause had been assigned for trial dismissed the claim on January 30, 1937, without prejudice, on the ground that the verification thereof was insufficient.

Before the order was entered dismissing the claim, but after the court had announced its decision, a second claim was presented to the administrator by Warren Herbert Charleston through his guardian *ad litem*, in much the same language as the first claim, except that it referred to one United States Liberty bond in the sum of $10,000, bearing interest at the rate of 4¼ per cent instead of 4½ per cent as mentioned in the original claim. This claim was also rejected by the administrator.

Prior to the presenting of the first claim to the court for allowance the final account had been filed by the administrator. The claimant filed objections to the approval of the final account, based upon the fact that his claim against the estate had not been finally determined by the court, and on the further ground that there were included in the property inventoried and appraised as bonds of the estate some securities which had been purchased with the proceeds of the sale of the $10,000 Liberty bond, which securities in fact belonged to the claimant; and that the administrator of the estate had money in its possession received by it from the sale of other securities which had likewise been purchased with the proceeds of the said Liberty bond. The objections to the final account reiterated the statements made in the second claim as to the gift of the $10,000 Liberty bond. Stated briefly, without attempting to set forth all the allegations contained in the claimant's objections to the final account, the claimant in effect asks the court to decree that the

decedent had on September 12, 1930, made a gift of this $10,000 Liberty Loan bond to him, and requests that he be declared the owner of so much of the securities then in the possession of the administrator as had been purchased with the proceeds of sale of the said Liberty bond, and given judgment against the administrator for the amount remaining of the proceeds of the bond and interest coupons attached not represented by securities then in the possession of the administrator.

The hearing of the claimant's objections to the final account and his petition incorporated in such objections was assigned by the judge of the probate department to another judge than the one who had heard the first proceeding. It is from the order and decree of that judge on the claimant's petition and objections to the final account that this appeal is prosecuted.

In the evening of September 12, 1930, Warren Herbert Norman, accompanied by two of his daughters, Mrs. Charleston and Alva May Norman, left by train for a trip to eastern points, including New York and Washington, D. C., and did not return to Portland until about the last day of October or the first of November.

Early in the morning of September 12, Mr. Norman telephoned to Ralph L. Charleston, father and guardian *ad litem* of the claimant, and asked him, according to Charleston's testimony, to meet him at the Commerce Safe Deposit Vaults, later succeeded by Broadway Safe Deposit Vaults, Inc., about 10 o'clock that morning, but did not state his purpose in making the request. Mr. Charleston arrived there about 10 o'clock and met his father-in-law, who called him aside and told him that he had a gift for Warren "in the form of security"

that he wished Charleston to take care of, asking Charleston if he had a safety deposit box. On being informed that Charleston had none, Mr. Norman requested that he "take one out at that time." In compliance with that request Charleston rented a box for a term of one year, paying the rent in advance. This box he retained until September 12, 1936.

After arrangement was made for a safe deposit box Mr. Norman, according to Charleston's testimony, went to his own vault, took out his box and he and Charleston went together to a small room, where Mr. Norman opened the box, and on top of the papers therein was a manila envelope, which was unsealed. Mr. Norman took from the envelope a $10,000 United States Liberty bond and showed it to Mr. Charleston, calling his attention to the denomination and asking if Charleston had ever before seen a bond that large, to which question the latter replied in the negative. There were attached to this bond an interest coupon for 1926 and all semi-annual coupons subsequent to that year. The fact that the coupons were attached was called to Mr. Charleston's attention by his father-in-law. After showing the bond and coupons to Charleston, Mr. Norman put the bond back in the envelope, sealed the same and gave it to Mr. Charleston to put in his own box.

Asked what Mr. Norman said when they were discussing the bond, Charleston testified: "He said: 'This bond is for the education of Warren Herbert Charleston.' Of course, he said 'for Warren', but in effect he said it, that it was the education of Warren Herbert Charleston, and on the outside of the envelope he had: 'For the education of Warren Herbert Charleston'—at the outside upper corner he had the year '1926' and he said: 'This is the year I set this aside for Warren.' "

While handling the bond, Mr. Norman, according to Charleston, said: "A person can never tell what may happen on a trip, accidents, et cetera." With specific reference to the inscription on the envelope, Charleston testified that it was in his father-in-law's handwriting. He was unable to state how long he and Mr. Norman were at the vaults, whether it was half an hour, two hours or any other period of time. Mr. Charleston was asked if Mr. Norman told him that he was giving the bond to him for Warren, and replied: "He said: 'I am giving this to you as a gift for Warren. Put it in your safety deposit box for him.' "

In compliance with the request of Mr. Norman, Charleston placed the sealed envelope in his own safety deposit box at once and kept it there until two or three weeks after Mr. Norman returned from the East. As to the circumstances of returning the bond to Mr. Norman, Mr. Charleston thus testified:

"Q. How did they happen to come back into Mr. Norman's possession? A. Well, I happened down by the ranch one morning and as I say, this was two or three weeks after his return; he returned, I believe, the thirtieth of October or the first of November, and at that time he said: 'I am back here and in perfectly good health.' And at that time he went on to say, if you want an explanation of that remark that I made just now, that was the reason why he said he wanted to have this bond in safe keeping, and he knew I would take care of them for Warren as a gift for Warren, and so when he got back he said: 'I am back here and in perfectly good health, and I will take these bonds and hold them for Warren.' "

At no time did Mr. Norman discuss with Mr. Charleston the kind of education he expected or wished Warren to receive, or when the bond or coupons were to be con-

verted into cash and the proceeds used for his education. During the time that Mr. Charleston had possession of the bond the interest coupon for October 15, 1930, became due, but he did not cash it, for the reason, as stated by him, that he did not think he was privileged to do so.

Mr. Charleston did not, when the bond was shown to him or while it was in his possession, make note of its serial number. Nor did he protest the redelivery of the bond to his father-in-law. After returning the bond Mr. Charleston had no further conversation with his father-in-law about it. He was, however, present, he testified, about three months prior to Mr. Norman's death when the latter was at the Charleston home for dinner and Mrs. Charleston asked her father "if he still had Warren's bonds, and he said: 'I have, and they are still intact on top of my safe deposit box.' "

In 1915 Mr. Norman purchased a home in Portland for the Charlestons and took back a mortgage from them in the sum of $2,500. This mortgage remained an incumbrance on the property until March, 1923, about the time of the christening of the decedent's grandson, Warren Herbert Charleston, who was born March 7, 1922. According to the testimony of Charleston, his father-in-law, in token of his appreciation of the child's being named for him, had Mrs. Charleston meet him at the courthouse, where he entered a marginal satisfaction of the mortgage.

Before Mrs. Charleston departed for the East on September 12, 1930, her husband, according to her testimony, advised her of the gift to Warren, and when an opportunity was presented on the trip and she was alone with her father, she thanked him for

his generosity. She stated that thereafter she talked with her father a number of times about Warren, his education and the bond which her father had provided for that purpose, and whenever she inquired about the bond her father told her it was perfectly safe and that "it is right on top of my box." She did not relate any specific conversation with her father about Warren's education.

Mr. Norman suffered a stroke, two or three weeks preceding his death. During his illness, about a week after he was so stricken, Mrs. Charleston called at the office of Judge Stearns, who had been her father's attorney for many years and had prepared Mr. Norman's will. She told Judge Stearns "about Warren's bond," according to her testimony, and "I told him he would find Warren's bond in Dad's box."

On cross-examination by Judge Stearns, Mrs. Charleston admitted that she did not mention the amount of the bond, which omission she thus explained, "because Dad did not want anybody to know about this bond or the amount". She further admitted that Judge Stearns advised her that he could not let her see a copy of her father's will, nor could he read the will to her until after her father's death. Her testimony in this connection is as follows:

"Q. Isn't it a fact that I [Judge Stearns] said at the time that if your father had intended to leave you any security for Warren that we would probably find it in the safety deposit box? A. Well, I said the envelope was in Dad's box.

"Q. Well, my recollection is a little different . . . I may be wrong, but I think I told you that we would probably find it in the box, if they were not mentioned in the will. A. Yes, if they were not mentioned in the will."

Judge Stearns was not a witness in the case, and the only account of the conversation in his office is that afforded by Mrs. Charleston's testimony.

Mr. Norman's safety deposit box was opened about ten or twelve days after his death, in the presence of Mr. Reid, representing the state treasurer, Mr. Taylor, assistant trust officer of the First National Bank, Judge Stearns, attorney for the administrator, Mrs. Charleston and her sister, Alva May Norman. They spent some three or four hours going through the many documents in the decedent's box.

Mrs. Charleston testified that when the box was opened there was found in it a legal size manila envelope which had been sealed and the end torn open. In the upper right-hand corner were the figures "1926", she stated, and across the face of the envelope was written, "For the education of Warren Herbert Charleston". Both the date and the inscription were in her father's handwriting, she testified. She had previously seen this envelope, she said, when she had gone with her husband to his safety deposit box upon her return from the East.

When the envelope was being examined by all those above mentioned, Mrs. Charleston did not say anything about expecting to find in it a bond for Warren, but, according to her statement, she "looked at Judge Stearns with a questioning look."

Mrs. Charleston also testified that about a week before her father's death she told her sister, Alva May Norman, about the bond, but did not mention the amount of it, for the reason that Alva was inordinately jealous when their father gave anything to Mrs. Charleston or her children. It does not appear from her testimony, however, that she told Alva or any one

else, except Judge Stearns, that Mr. Norman had made a gift of the bond to Warren.

Mr. Rudolph F. Prael, president and part owner of the Broadway Safe Deposit Vaults, called as a witness on behalf of the claimant, stated that he had known Mr. Norman from 1911 until the date of his death, and that for many years he had only a speaking acquaintance but became "quite friendly" with him in the last few years of his life. He testified that one day Mr. Norman asked for the key to his vault and Prael spoke jokingly to him about accumulating something for his old age. When Mr. Norman returned to the vault from the booth "he had an envelope and he said: 'I am laying aside this for my grandson's education.' I do not remember the amount although he may have mentioned the amount."

As to the envelope hereinbefore mentioned, Mr. Prael testified that there was some writing on it, "nothing extensive". He thought there were some figures on it, but did not remember seeing any name. When he saw the envelope, at the time the above mentioned conversation was had, he was standing about a foot from Mr. Norman, and, "We were talking confidentially." He also testified that Mr. Norman was rather secretive about his affairs and had never previously mentioned them to him.

M. A. Taylor, assistant trust officer of the First National Bank and actively in charge of the administration of the Warren Herbert Norman estate, was out of the state at the time of the second hearing and not available as a witness, wherefore his testimony on the first hearing was read into the record. He testified to the effect that he was present at the time the safe deposit box was opened, and among the contents

of the box was "a manila envelope, large size, not the ordinary letter size envelope", which "apparently did have on the outside of it the name of Warren Herbert Charleston" written by hand, although he was not sufficiently familiar with Mr. Norman's handwriting to state whether it was his or another's. Mr. Taylor did not, however, recall any other writing on the envelope nor did he notice any figures on it. He "did not make a study of the back of the envelope", as it was found to be "just an empty container". He was unable to state whether it had been sealed and later opened. The envelope was no longer in the possession of the administrator of the estate, and Mr. Taylor was unable to say what had become of it. Apparently it had been discarded prior to the raising of any question, so far as concerned the administrator, of its having contained a bond or bonds set aside by the decedent as a gift to his grandson.

Mr. Taylor stated that there was a memorandum in the decedent's safe deposit box indicating that H. E. Bald & Co. of Portland had in its possession securities belonging to Mr. Norman. On investigating this matter he found that on or about September 13, 1935, Mr. Norman delivered to H. E. Bald & Co. a $10,000 fourth series Liberty Loan bond callable 1933-1938, with coupons from October 15, 1935, attached. This bond was sold September 13 by H. E. Bald & Co. through another bond house for $10,043.75, plus accrued interest to September 16, 1935, in the amount of $178.26. Between September 13 and September 17, 1935, H. E. Bald & Co. purchased for Mr. Norman securities totaling $9,956.72, and on September 17 sent him a check for the difference between that sum and the amount received by it as proceeds of the Liberty bond, or

$265.29, which check was endorsed and cashed by Mr. Norman.

Shortly after the Liberty bond was turned over to H. E. Bald & Co. Mr. Norman suffered a stroke, as above stated, and during his ensuing illness the securities purchased with the proceeds of the bond were not delivered to him, but were later turned over to his administrator by H. E. Bald & Co. Between June 25, 1936, and December 31 of that year, while the claim of Warren Herbert Charleston was pending and undetermined, the administrator sold and disposed of five bonds of the par value of $1,000 each which had been purchased by H. E. Bald & Co. for Mr. Norman with proceeds from the sale of the Liberty bond.

At the time the said Liberty bond was turned over to H. E. Bald & Co. there were not attached to it any interest coupons preceding the one due October 15, 1935. Efforts were made during the trial to show what had become of the interest coupons from October 15, 1926, until the latter date. The semi-annual interest on the bond was $212.50, and there was no deposit in the decedent's checking or savings account of any such amount or any multiple thereof subsequent to June, 1926. There was, however, at that time a deposit of $212.50 by Mr. Norman, which is contended by the claimant to represent the interest coupon that matured April 15, 1926.

Mr. H. E. Bald, president of the investment company bearing his name, was unable to appear as a witness at the second trial, due to illness, and therefore his testimony on the former hearing was made a part of the record in the present proceeding. He testified substantially as did Mr. Taylor with reference to the sale of the Liberty bond by his firm at the request of Mr.

Norman. He further stated that Mr. Norman did not intimate to him that he was holding the Liberty bond as trustee or agent for anybody, or that any one other than himself had any interest in the bond.

Warren Herbert Charleston, the claimant, was called as a witness in his own behalf. He identified a letter which had been written to him by the decedent September 20, 1930, from Washington, D. C., which merely related what the boy's grandfather, mother and aunt were doing on their trip and asked Warren to write and tell him "how all of you folks are getting along in Portland" and how the boy was doing in school. The claimant did not remember ever receiving any other letter from his grandfather, except one, possibly, while he was at the beach. He further stated that he supposed his grandfather was as much interested in his brother's education as in his.

We shall now refer to the evidence produced by the administrator and the intervenors, in opposition to the claim. Mrs. Baton, one of the intervenors, did not appear personally, for the reason that she was mentally incompetent and under the care of a guardian.

Alva May Norman, the other intervenor, testified that she did not have any conversation with her sister, Mrs. Charleston, before their father's death, concerning the gift of a $10,000 bond to Warren or to any one else, but that she did, however, have a conversation with Mrs. Charleston about a bond when they were driving home after their father's safety deposit box had been opened. Her testimony relative to that discussion is as follows:

"A. Mrs. Charleston opened the conversation concerning the bond. She said: 'Those receipts in the box must have been for the bonds that were supposed to be

in the envelope with Warren's name on it,' and I said: 'How do you know that there was supposed to be bonds in that envelope?' And she said: 'Because Dad gave them to me.'

"Q. Gave them to her? A. Yes. And I said: 'Why don't you have them now?' And she said: 'When Dad gave them to me he said: "If the time ever comes I need those I want you to give them back to me." Well, you know, of course, I promised that I would.'

\* \* \* \* \*

"Q. What did you say? A. I said: 'Ten thousand dollars is an awful lot of money, Hazel. Did you see the bond?' And she said: 'No, the envelope was sealed when Dad gave them to me.' Just a minute after telling Dad gave them to her. When she said—I—she said: 'When Dad gave them to me, he said: "If the time ever comes that I need these or should ask you to give them back to me, will you?" And I promised I would, but, of course, I should never have given them back.' And I said: 'Well, Hazel, that is a lot of money. How do you know there was that much in there? Did you see the bond?' And she said: 'No, the envelope was sealed when Dad gave them to me.' "

This conversation, however, was denied by Mrs. Charleston. Miss Norman further testified that in 1935, in the latter part of May or early in June, while listening to the radio she heard an announcement that the federal government was calling a particular series of bonds and when her father came home to lunch she asked him if he had a bond of that series, and he stated that he did have one such bond, for $10,000.

On September 12, 1930, the day when the gift is alleged to have been made by Mr. Norman to Warren, Miss Norman drove her father to the business section of Portland and took him several times to the Commerce Safe Deposit Vaults. The first time he was there he did not remain more than two or three minutes, ac-

cording to her statement. He was there once in the morning and two or three times in the afternoon. Each time, he went to his box, but she did not go with him.

Miss Norman testified that she was at the safety deposit vaults at the time her father's box was opened, after his death, and that there was found in the box an empty envelope with an inscription on it, thus described by her: " 'Warren H. Norman', in his own handwriting, and in smaller writing and in different color of ink, 'Warren Herbert Charleston.' " She did not see any figures on the envelope. Mr. Reid picked it up, she testified, and read the name of her father and the name of Warren Herbert Charleston. He then held it up to the light and said: "This is of no consequence; there is nothing in it." And he laid it down. Mrs. Charleston, according to Miss Norman, asked to see the envelope and it was handed to her, but she did not make any remark about its being empty.

Miss Norman testified that she telephoned to Mrs. Charleston March 6, 1936, requesting her to sign a paper consenting to the administrator's selling the decedent's automobile to Miss Norman, and that Mrs. Charleston refused to sign, "and she said: 'I don't see why I should make all the concessions,' and then she said: 'I will never feel right about Warren's bond,' and I said: 'What am I to do? If Dad wanted him to have them he would have named them in the will,' and she said: 'I should never have given them back, but I am not of the grasping kind.' "

Miss Norman further testified that after her mother's death her father made a confidant of her and discussed his business affairs to a limited extent with her. In substantiation of this testimony she produced as an exhibit a written request signed by Mr. Norman,

addressed to an officer of the safe deposit vaults, to give Miss Norman access to his box, No. 9271, until further orders, for the reason that he was going to a Portland hospital for surgical treatment. This authorization was dated July 8, 1932, and was never used by Miss Norman. According to the vault records, no one except Mr. Norman ever had access to his safe deposit box during his lifetime.

Peter Hedstrom, who had lived with Mr. Norman in his home from 1921 until the latter's death, stated that he had helped Mr. Norman with some of his houses and with the work about his ranch. He testified that he was a construction engineer and for three months in 1936 had been employed in the engineering department of the United States forestry service. At the time of the hearing he was helping Miss Norman in the care of Mrs. Baton. He testified that he had frequently talked with Mr. Norman about the latter's investments; that in the summer of 1935 Mr. Norman stated that he had a $10,000 bond, which ''he had to turn in, and he said he did not know what to invest it in.'' Mr. Hedstrom also testified that Mr. Norman ''said: 'One used to be able to put it in real estate, but now nothing is safe', and he asked about Portland Gas and Eastern Utilities.'' Hedstrom further testified as follows:

''Q. And following this what did he say about a bond or bonds he had left with Mr. Charleston?

\* \* \* \* \*

A. Do you want the whole story? Q. Yes, sure I do. A. About—well, this is the way it started—when he contemplated taking this trip back east he had not thought of taking Mrs. Charleston. He was just going to take Miss Norman and himself, and he cautioned me not to tell any one he was going, neither one of the two sisters, and then one day, when it came to go, he took the two sisters and himself, Mrs. Charleston and

Miss Norman. Having told me he was only going to take Miss Norman, when he got back I asked how it happened he took Mrs. Charleston and he said he told her he was going and was not going to take her, and why, she raised an awful fuss about it."

This answer was stricken out on motion of counsel for the claimant, apparently on the objection previously raised that it was not a declaration by the decedent against interest. Hedstrom then resumed his testimony, as follows:

"Q. And about this bond issue after he returned? A. He told me when he had to take Mrs. Charleston it took more money than he figured and he had to borrow some money to make the trip and it had depleted his bank account, and in order to protect himself on his trip back east he left his bond with Mr. Charleston, and that he explained if anything happened to him on his trip east he could raise money on it and bring him back."

A motion to strike out this answer as not a statement of the decedent against his own interest was denied and the court said that the testimony might be considered for what it was worth. The witness thus proceeded:

"A. And he [Mr. Norman] said, as soon as he got back he asked for the bond to be returned. He said it was a dangerous thing to leave something like that in somebody else's possession. He said if anything happened to him he never would have gotten it back, meaning if he died."

This last statement was made by the decedent, according to the witness, about a month or six weeks after Mr. Norman's return from the East.

Mr. Hedstrom also testified that the decedent's estate had recovered a judgment against him in the amount of $329.

In connection with this witness's testimony as to the reason given by Mr. Norman for turning the $10,000 bond over to Mr. Charleston, it is appropriate to direct attention to the decedent's savings account with Portland Trust and Savings Bank as shown in his passbook, which was introduced in evidence by the claimant for the purpose of ascertaining whether or not Mr. Norman had made any deposits of semi-annual interest on the $10,000 bond. This book shows that on September 9, 1930, three days before Mr. Norman left for the East, he withdrew $500 from his savings, leaving a balance of $3,500. It further discloses that on November 5, 1930, only four or five days after his return to Portland, he made a deposit of $500, and that between those dates nothing was withdrawn or deposited in his savings account. Nothing appeared in evidence as to the state of the decedent's checking account during this period.

Reverting to Mr. Hedstrom's testimony, it appears that he sat through the first hearing and was not called as a witness, and that he did not mention to the attorneys for the claimant until after the first hearing anything about his conversation, above related, with Mr. Norman. On redirect examination he stated that he had told Miss Norman "what I had to testify and she had been assured by the lawyers there was no need of my testifying."

Jonas Klopfenstein, who had been a police officer of the city of Portland for more than twenty years, stated that he had known Mr. Norman since 1913, and in explaining a conversation with Mr. Norman to which he testified, this witness said: "I went to Mr. Norman and I asked him for some money. He always financed me in my building, and he told me he had a $10,000

bond he was disposing of at the present time, and as soon as he disposed of that he would help finance me on my building." A motion was made to strike this testimony, and the court allowed it, but ruled that the testimony might "be considered in evidence as taken under the statute", referring to § 6-202, Oregon Code 1930. Klopfenstein further testified that he had a talk with Mr. Norman about disposing of his property and the decedent said that he would not part with his property as long as he lived, and that all of it would be disposed of by will. It was in the early spring of 1935 that this witness spoke to Mr. Norman about borrowing money to use in his building operations. The loan he obtained from the decedent was $3,000, which was paid to him in cash. He was unable to say where Mr. Norman procured the money.

The attorney for the claimant who prepared the first claim against the estate testified that before presenting a written claim to the administrator he talked with one of the officers of the bank about the claim and was led to believe that the bank as administrator would present the matter to the court without the necessity of filing a formal claim and would ask the court for a ruling as to whether the administrator should comply with the demand of the claimant. He also stated that Mr. Charleston, when calling upon him to prepare the claim, did not advise him whether it was for one bond of $10,000 or ten bonds of $1,000 each, but he had thought of it as ten $1,000 bonds, "and the papers were drawn on that basis."

The "inventory and appraisement" of the estate, which was filed December 7, 1935, has listed as assets of the estate, among other promissory notes, the following: note of R. L. Charleston dated June 27, 1911,

due two years after date, in the amount of $500, with interest at seven per cent; note of Hazel G. Charleston dated January 15, 1929, for $500, with interest at six per cent; note of R. L. and Hazel G. Charleston dated July 13, 1933, for $1,500, with interest at six per cent; note dated May 26, 1933, signed by Ralph L. Charleston and Olaf B. Aagaard, in the sum of $1,500, with interest at six per cent; and note of R. L. Charleston dated September 5, 1934, for $25, with interest at seven per cent. All these notes were unsecured. The inventory does not disclose the amount of interest due on them. No part of the principal of any of them had been paid, except Hazel G. Charleston's individual note of $500, which showed a balance of $476.22 due on the principal.

Preliminary to a determination of whether or not Mr. Norman on September 12, 1930, made a gift of the $10,000 Liberty Loan bond to his grandson, we shall dispose of certain objections raised by the appellants to the procedure in the circuit court. It was urged during the hearing there and before us here that the administrator and the intervenors were entitled to a jury trial and that error was committed by the circuit court in refusing to submit the cause to a jury for determination.

In this proceeding the claimant was objecting to the approval of the administrator's final account, and accompanying his objections the claimant filed his petition to have the court determine that he was the owner of and entitled to certain securities which had been purchased by the decedent with proceeds from the sale of the Liberty bond. These securities had been inventoried as part of the assets of the estate and at the time the objections to the approval of the final account were first made they were in the possession of the administrator. This proceeding, therefore, is equitable

in nature and although the claimant might have asserted that the decedent had converted the Liberty bond to his own use and might then have proceeded in an action at law against the estate for conversion, nevertheless he was not compelled to choose that course. He had a right, and exercised it, to assert his claim directly to the securities purchased with the proceeds of sale of the Liberty bond.

■ Another contention urged by the appellants is that a proceeding of this kind cannot be maintained in a probate court. This objection, however, is answered adversely to their contention in the case of *In re Norman's Estate*, 159 Or. 197, 78 P. (2d) 346, wherein the appellants in this case attempted to appeal from the ruling and orders of the circuit court in this identical proceeding, urging as one of the grounds of their attempted appeal that the probate court did not have jurisdiction to hear and determine the matters sought to be presented by the claimant. The decision of this court on that appeal is the law of this case.

■ It is further urged by the appellants that the first claim filed was for a money judgment against the estate and that by filing such a claim the respondent thereby made an election of remedy which prevented him from subsequently asserting a claim of ownership of specific property in the hands of the administrator. As hereinbefore pointed out, the first claim was for "the avails or proceeds of certain securities" which were alleged to have been given by the decedent to Warren Herbert Charleston. It is apparent from reading the entire claim as presented that that proceeding was not intended to limit the claimant's recovery to the amount realized by the decedent from the bond and coupons thereto attached.

Both the appellants and the respondent concede that if the delivery of the Liberty bond by Mr. Norman to Mr. Charleston for the benefit of the latter's son Warren was intended as a gift *causa mortis*, it was not effective as such, because the bond was redelivered to Mr. Norman on his return from the East. However, we do not believe that it was intended as a gift of that nature, for the reason that Mr. Norman on the very day that the gift was alleged to have been made executed his last will and testament, which undoubtedly had been in preparation for some time prior to its execution. In this connection should be considered the further fact that Mr. Norman was in good health at the time he departed for his trip.

In approaching the question of whether this was a gift *inter vivos* the appellants and the respondent alike rely upon the following statement of the factors necessary to constitute such a gift, set forth by this court in *Grignon v. Shope*, 100 Or. 611, 616, 197 P. 317:

"The essential elements of a gift *inter vivos* are, (1) a donor competent to contract; (2) freedom of will of donor; (3) the gift must be complete and nothing left undone; (4) the property must be delivered by the donor and accepted by the donee; (5) the gift must go into immediate and absolute effect: Merc. S. D. Co. v. Huntington, 89 Hun. (N. Y.) 465, 469 (35 N. Y. Supp. 390). A gift on condition of the happening of an event that it shall revert to the donor renders the gift invalid."

It is a well-settled rule of law that when the gift is complete the whole title of the donor passes from him to the donee, and a subsequent redelivery of the subject-matter of the gift to the donor to keep for the donee will not disturb the title of the latter in the thing given: *Beaumont v. Beaumont*, 152 Fed. 55; *Matthews v. Hoag-*

*land,* 48 N. J. Eq. 455, 21 A. 1054; *Corle v. Monkhouse,* 50 N. J. Eq. 537, 25 A. 157; *Reese v. Philadelphia Trust, Safe Deposit and Ins. Co.,* 218 Pa. 150, 67 A. 124, 120 Am. St. Rep. 880.

In *Beaumont v. Beaumont,* supra, in upholding a gift *inter vivos* the court stated:

"In Matthews v. Hoagland, *supra,* a father sent for his son and daughter. They went to his old home and were told to come up stairs, as he had something for them. They went up stairs with him, into his bedroom. He took his box out and took certain papers out of the box and handed them to them, saying: 'Here, take these. Life is uncertain and they are yours.' The papers consisted of certain mortgages he held against the daughter; also railroad stocks and bonds. The children then said they did not want to use the things given them then, and asked their father to keep them, and handed the papers back to him, and he replaced them in the box, putting the box back in his secretary. After this, the father collected the interest and dividends on these securities. It was held by Vice Chancellor Green that this constituted a valid gift to the children, saying in the course of his opinion (page 485 of 48 N. J. Eq., page 1065 of 21 Atl.) : 'If the gift is complete, the whole title of the donor has passed from him to the donee and the subsequent redelivery of the subject matter of the gift to the donor, to keep for the donee, will not disturb the title of the latter in the thing given.' "

We find the following statement in 12 R. C. L. 936, § 13:

"The mere custody of the property, after an alleged completed gift, is subject to explanation, as it may bear on the question whether there was an executed gift. Under some circumstances, when all the other requisites of a gift are presents [present] the donor may by declarations or otherwise constitute himself trustee of the property for the benefit of the donee, or the retention of possession by a donor may be accounted for by

proof of an agreement to pay hire for the property given. And so there may be circumstances of redelivery to the donor as agent for the donee for safekeeping or as a loan.''

■ In the case before us, after giving most careful consideration to all the evidence presented, we are of the opinion that the decedent on September 12, 1930, made a valid gift of the $10,000 Liberty bond, together with the coupons thereto attached, for October 15, 1926, and all coupons subsequent thereto, to Warren Herbert Charleston, the claimant, through his father. We are led to this conclusion by the following evidence: the direct and positive testimony of the claimant's father and guardian *ad litem* as to what occurred on that date; the fact that a safe deposit box was rented at that time and paid for by Mr. Charleston; the statement of the claimant's mother that she had seen the manila envelope in her husband's safe deposit box and her testimony that her father had told her numerous times that her son's bond was safe in his vault; the virtual admission on the part of the appellants that Ralph L. Charleston did at that time have possession of the bond in question; the fact that after Mr. Norman had suffered a stroke Mrs. Charleston went to Judge Stearns and called his attention to the gift of a bond by her father to Warren; the statement of Mr. Prael that Mr. Norman told him, about a year before his death, in reference to his accumulated wealth, ''I am laying aside this for my grandson's education,'' indicating an envelope of the general appearance of the manila envelope described by Mr. Charleston as containing the bond; the admission, supported by testimony of several witnesses, including one of the appellants, that at the time the decedent's safe deposit box was opened there was

found in it a large, empty manila envelope, with the name of Warren Herbert Charleston written on the outside; the undisputed testimony that this name was in the handwriting of the decedent; the fact that three days before leaving for his trip East, *i. e.*, September 9, 1930, Mr. Norman withdrew from his savings account the sum of $500, leaving a balance of $3,500 in that account; the possibility that Mr. Norman may have left the manila envelope in his safe deposit box for the purpose of placing in it the substituted securities purchased with the proceeds of the Liberty bond, delivery of which securities to him was prevented by his stroke and serious illness; and the many other matters to which we have hereinbefore called attention.

In referring to the empty envelope which was in the decedent's box at the time it was opened, Miss Norman stated that there was written thereon the name of Warren Herbert Norman and that the name of Warren Herbert Charleston was also written on the envelope, in another color of ink and in writing smaller than that forming the decedent's name; but she did not state that the name Warren Herbert Charleston was not in her father's handwriting. Mrs. Charleston testified that there was on the envelope the notation "For the education of Warren Herbert Charleston". Mr. Taylor, of the First National Bank, who was actively in charge of the administration of Mr. Norman's estate, also testified that the name Warren Herbert Charleston was on this envelope. Mr. Prael stated that he thought the envelope he saw had some figures on it, but not any extensive writing.

Hereinbefore we have mentioned two conversations which Miss Norman testified she had had with her sister, Mrs. Charleston. She stated that in the first con-

versation Mrs. Charleston spoke of the $10,000 bond as having been given by their father to Mrs. Charleston; and in relating a telephone conversation which she says she had with Mrs. Charleston a few months after the first one mentioned, but before the claim was filed, she reports Mrs. Charleston as speaking of "Warren's bond". Had Mrs. Charleston, on the day the box was opened, told Miss Norman that their father had given her this bond, it seems strange that Miss Norman did not later call her sister's attention to the variance in her references to the bond, during their telephone conversation. And had Mrs. Charleston spoken of the bond as her own at another time, Miss Norman would scarcely have said: "What am I to do? If Dad wanted him [Warren] to have them he would have named them in the will."

The testimony of Peter Hedstrom as to the reason given by Mr. Norman to him for turning the bond over to Mr. Charleston on September 12, 1930, is unreasonable and unconvincing. Apparently, from the entries in the decedent's savings account book, his financial status was not at all as Hedstrom says he represented it, and it is unreasonable to assume that he would have intended his son-in-law to use the Liberty bond in an emergency as security to raise money for him or to sell it and send him the proceeds, when he had $3,500 available in his own savings account.

If it is a fact that the decedent set aside the bond for Warren, his namesake, in 1926, as Mr. Charleston testified, and actually turned it over to Mr. Charleston on September 12, 1930, such action on the part of the decedent is consistent with the fact that this gift was not mentioned in the will which Mr. Norman executed that day.

It is difficult to understand why Mr. Norman did turn this bond over to Mr. Charleston at the time he did, unless he intended it as a gift for Warren. No other explanation of his action has been offered, except the implausible reason assigned by the witness Hedstrom and the suggestion on the part of the appellants that the gift, if made, was one *causa mortis*.

The circuit court after seeing all the witnesses and hearing them give their testimony reached the conclusion that the gift was made as the respondent contends, and in a case of this nature due consideration should be given to the court's findings and decision.

In arriving at the conclusion herein stated we are not unaware of the rule which requires gifts of this kind to be established by clear, satisfactory and convincing evidence. Neither have we overlooked the presumptions arising from the fact that Mr. Norman after the gift was made had the bond in his possession, and that apparently in disposing of it he treated it as his own.

The decree appealed from is affirmed.

RAND, C. J., and BELT and LUSK, JJ., concur.