Argued and submitted February 22, reversed and remanded with instructions
November 14, 1985

# NEUSCHAFER et al,
*Appellants,*

*v.*

# McHALE,
*Respondent.*

## (81-1542; CA A31222)

709 P2d 734

Allyn E. Brown, Newberg, argued the cause for appellants. With him on the briefs was Brown and Tarlow, Newberg.

Kaye D. Brand, McMinnville, argued the cause for respondent. With him on the brief was Craig, Brand and Lake, McMinnville.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

YOUNG, J.

### YOUNG, J.

In this declaratory judgment action, the trial court declared that defendant McHale, "by virtue of a gift of a future interest therein," acquired title to 1,103 shares of stock in American Telephone and Telegraph Company (AT&T) and two dividend reinvestment accounts. Plaintiffs appeal and contend that they did not possess the requisite donative intent to make a valid gift *inter vivos*. We reverse.

Our initial concern is the scope of our review. A declaratory judgment proceeding may be legal or equitable in character. *Kuhn v. Heerwagen,* 43 Or App 755, 757 n 1, 604 P2d 416 (1979). If it is equitable, we review *de novo*. ORS 19.125(3). If it is legal, we must affirm the judgment of the trial court if there is any evidence to support it. *Port of Portland v. Maxwell,* 9 Or App 105, 111, 496 P2d 23 (1972).

The parties agree in their briefs that this declaratory judgment proceeding is essentially equitable. Although we are not bound by that agreement, *see May v. Chicago Insurance Co.,* 260 Or 285, 292, 490 P2d 150 (1971), we think that the parties are correct. The Supreme Court has stated:

"[W]hether an action for declaratory judgment is to be treated as an action at law or as a suit in equity normally depends upon the essential nature of the case, including the nature of the relief sought." *State Farm Fire v. Sevier,* 272 Or 278, 299, 537 P2d 88 (1975) (footnote omitted).

The essential underlying nature of this case is a proceeding to quiet title to personal property. It bears a striking resemblance to *Rogelis v. Pettis,* 49 Or App 537, 619 P2d 1339 (1980), *rev den* 290 Or 449 (1981), the facts of which were:

"The parties cohabited together in California in 1964 for approximately seven months prior to coming to Oregon to live. In March, 1965, 20 acres of land was conveyed to the parties in the names of 'Louis M. Rogelis and Dorothy M. Rogelis, husband and wife.' The parties were not then, nor have they ever been, husband and wife. Plaintiff paid for the land from money he had saved before retiring from the Navy. The parties sold 10 of the 20 acres to plaintiff's nephew. The parties purchased a mobile home which they lived in on the property until a home was constructed. Plaintiff did most of

the construction on the home, contracting only minor portions out to others. The parties moved into the home in the fall, 1966, and lived together there until January, 1971, when defendant moved out of the home.

"In 1975, plaintiff married. In 1977, paintiff desired to sell the property and asked defendant to sign a quit claim deed, which she refused to do. This [suit to quiet title] then ensued." 49 Or App at 539.

The trial court quieted title in plaintiff. We reversed, stating:

"A suit to quiet title is an equitable proceeding and we review *de novo*. ORS 19.125. From our view of the record we find there was an intent on the part of the parties to own the property jointly." 49 Or App at 539.

There are several similarities between *Rogelis* and the present case. First, there is a document in both which apparently created a valid joint interest. Second, the plaintiffs asked the defendants to release any interest they held. Third, defendants refused. Fourth, the underlying issue is the intent to create a present joint interest.

■ There is one major difference: *Rogelis* involved real property; this case involves personal property. Although actions to quiet title to personal property are rare in Oregon, they have occurred, *see Davis v. Wood et ux,* 200 Or 602, 613, 268 P2d 371 (1954); *Endicott v. Digerness,* 103 Or 555, 559, 205 P 975 (1922), and the Supreme Court treated them as equitable in nature. We conclude that the nature of this case is essentially an equitable proceeding to quiet title to personal property. Therefore, we review *de novo*. ORS 19.125(3); *see Kuhn v. Heerwagen, supra.*

The parties are three generations of the same family. Plaintiff Neuschafer is the mother of plaintiff James and the grandmother of defendant McHale; James is McHale's mother. In 1945, the family moved from Illinois to a farm near Newberg. During McHale's youth, Neuschafer indulged him with innumerable gifts, and as he grew older she continued the gifts, usually money. She paid his college expenses and gave him the down payment for his first home in California. Neuschafer's generosity continued until 1981.

Neuschafer and James, through their employment with AT&T, and by their individual purchases, acquired stock

in AT&T. By 1963, Neuschafer owned 1,103 shares and James 416 shares. In addition, each owned an AT&T stock dividend reinvestment account. In 1963, with the aid of a local banker, they named McHale as a joint tenant with right of survivorship on their respective stock and accounts. Neuschafer named McHale as a joint tenant with her on a block of 498 shares and on her account. She named James and McHale as joint tenants with her on her remaining 605 shares. James named McHale as a joint tenant with her on all of her stock (416 shares) and on her account. New stock certificates were issued, and the reinvestment accounts were changed to joint tenancies. Plaintiffs continued in possession of the stock certificates and accounts. They received notices and proxies, voted the shares and received the dividends. When plaintiffs created the joint tenancy, no gift tax returns were filed. Plaintiffs continued to report the dividends as their taxable income.

In 1981, McHale retired and moved back to the Newberg farm, where he started building a house. In order to permit some estate planning, James asked McHale to remove himself as joint tenant on her stock; he complied with her request. Her reinvestment account remained in the joint names of James and McHale, although there is evidence that he agreed to "sign off" that account as well.

During the months of July through October, 1981, Neuschafer was seriously ill and hospitalized. During that time McHale claimed the July and October quarterly cash dividends paid on the block of 498 shares in the joint names of Neuschafer and McHale. Although Neuschafer had given McHale amounts of money that often equalled the cash dividends on the 498 shares, she was concerned that, because of her health, she would need the dividends to pay her expenses. However, McHale's persistence eventually prevailed, and he obtained the checks.[1] That episode caused a serious breach in the relations of the parties. Shortly thereafter McHale asked Neuschafer to transfer to him the block of 498 shares. She refused, and this action followed.

---

[1] Apparently, before 1970 plaintiffs negotiated their respective dividend checks without McHale's endorsement. On March 7, 1970, McHale gave Neuschafer a special power of attorney to exercise total control over his interests in plaintiffs' stock and dividends.

Plaintiffs sought a declaration that defendant had no interest in the 1,103 shares of stock originally owned by Neuschafer and the two reinvestment accounts. The trial court determined that defendant's claim that there was an agreement to bequeath the stock was unfounded and denied his counterclaims.

The pertinent portion of the judgment provides:

"1.   Defendant, JAMES McHALE, by virtue of a gift of a future interest therein, is entitled to full title to the following described stock and dividend reinvestment accounts upon the death of plaintiff, EULALIA NEUSCHAFER. Until the death of EULALIA NEUSCHAFER, defendant, JAMES McHALE, has no present interest in and to such stock and such dividend reinvestment accounts, and plaintiffs, EULALIA NEUSCHAFER and EULALIA JAMES, are entitled to the dividends from such stock and reinvestment accounts as may be declared up until the death of EULALIA NEUSCHAFER. Upon the death of EULALIA NEU-SCHAFER full right, title and interest in and to such stock and reinvestment accounts shall vest in defendant, JAMES McHALE. The stock shall vest in defendant, JAMES McHALE. The stock and dividend reinvestment accounts subject to this declaratory judgment are identified as follows: [stock and reinvestment accounts identified]."

By the terms of the judgment, McHale is the donee of a future interest in 1,103 shares of stock originally in the name of Neuschafer, together with the two reinvestment accounts originally in the separate names of Neuschafer and James. Until Neuschafer's death, plaintiffs are entitled to the dividends. On Neuschafer's death, McHale will become the sole owner of the stock and the two accounts.[2]

We turn to plaintiffs' four assignments of error. They involve essentially the question of whether plaintiffs intended in 1963 to make a gift *inter vivos* to McHale. The essential

---

[2] The judgment has caused us some difficulty. First, it measures James' interest in her reinvestment account by the life of Neuschafer. There is no explanation in the record for that, and there is no evidence to support that disposition. In addition, the disposition of the 1,103 shares does not take into consideration that on 605 of those shares James is one of the joint tenants. By the terms of the judgment it appears that on Neuschafer's death McHale would become the sole owner of the 605 shares to the exclusion of James. McHale did not claim an interest superior to that of James in those shares; neither does he contend that James' interest in the stock is void.

elements of a gift *inter vivos* are stated in *Johnson v. Steen,* 281 Or 361, 369, 575 P2d 141 (1978).

> "*[A]n intent on the part of the [donor] that there be a gift that goes into immediate and absolute effect,* that there be delivery by transfer of possession and absolute dominion over the subject of the putative gift and acceptance of the gift by the claimed donee." (Emphasis supplied; citations omitted.)

As to the intent element in the present case, the trial court determined that

> "[t]he intent of Mrs. Neuschafer to make a gift at the time she caused [McHale's] name to be placed on the stock certificates and the investment accounts has been conclusively established by her own testimony and the documents evidencing [McHale's] interest in the securities."

In reaching that conclusion, the trial court relied on *Manning v. U.S. National Bank,* 174 Or 118, 148 P2d 255 (1944), and *Simonton and Prichard v. Dwyer, et al,* 167 Or 50, 115 P2d 316 (1941).

*Manning* was an action for a judgment declaring the rights of the parties in 100 shares of stock. The donor had delivered the stock certificates to a bank and had had new certificates issued, reciting co-ownership with his wife with right of survivorship. The court said that "[t]here is uncontradicted oral evidence tending to indicate that the stock was transferred with a donative intent *but we consider the written instruments decisive on that issue.*" 174 Or at 131. (Emphasis supplied.) In *Simonton,* the issue was whether a father's failure to deliver his daughters' certificates of stock during his lifetime precluded their claims of gifts *inter vivos* when the father had surrendered the certificates and had them cancelled and reissued in the daughters' names but had kept possession. The court held that the gifts were valid:

> "By causing the transfer to each of the plaintiffs of 50 shares of stock in the corporation upon its books and having new certificates issued for that number of shares in the name of the plaintiffs, the father divested himself of all right, title and interest in the stock thus transferred and vested the legal title thereto in the plaintiffs, and thereby irrevocably placed the stock beyond his dominion or control. That this transfer was made under his direction is proved by his own signature as president on the certificates issued in the name of the plaintiffs. He thus placed himself in the position that any interference by him with the stock without consent of the

plaintiffs would be unauthorized and unlawful and, hence, the rights of the plaintiffs in no manner depended upon delivery of said certificates to them." 167 Or at 57.

*Manning* and *Simonton* are distinguishable from the present case. Although *Manning* can be interpreted to mean that transfer of a stock certificate conclusively demonstrates donative intent, the Supreme Court has recently held otherwise. *Johnson v. Steen, supra,* involved a joint bank account. The donor was alive and able to testify as to the circumstances surrounding the alleged gift. The court stated:

> "In his deposition and in the letter of December 1, 1975, to Lillian Steen, the ward emphatically denied he intended to make an *inter vivos* gift of the certificate. Defendants argue this evidence is immaterial respecting his earlier intent; they cite *Manning v. U.S. Nat. Bank, supra.* In that case we stated the intent of the alleged donor subsequent to the purported gift was not material. We also stated that evidence of the alleged donor's conduct after the date of the purported gift merits consideration and is relevant as it bears on the donor's intent at the time of the alleged gift. The testimony of the ward in his deposition and his statements in the letter do not establish a subsequent intent but are relevant and material to his intent on September 23, when the certificates were reissued. This evidence should be considered along with the claimed donee's testimony concerning this event."[3] 281 Or at 370.

In the present case, plaintiffs testified that their intention in 1963, in placing McHale's name on the stock, was to "avoid probate."[4] That evidence is probative on the issue of

---

[3] After *Johnson v. Steen, supra,* was decided, ORS 708.616 was enacted. *See* Or Laws 1977, ch 555, § 4. It deals with the ownership of joint accounts when one of the individuals named on the account dies.

[4] Neuschafer testified:

"Q. What was your reason for making this stock joint with these individuals?

"A. Because they said when I passed on, it wouldn't have to go through Probate Court. It would go directly to them. That is the reason I put the names on like that.

"Q. At that time, did you intend on making a complete and absolute gift of this stock either to Jim or to your daughter and your grandson?

"A. Yes, after I've died, it was to go to them.

"Q. But at that time, at that time in 1963, while you are still alive, what was

plaintiffs' intent at the relevant time. *Johnson v. Steen, supra,* 281 Or at 371. A gift *inter vivos,* by definition, is perfected during the lifetime of the donor and donee. *Johnson v. Steen, supra.* A gift to take effect in the future or at the death of the donor is void. As stated in *Allen v. Hedrick,* 104 Or 202, 218, 206 P 733 (1922):

"If the decedent intended to do nothing more than to

---

your understanding and intent as to who owned the stock?

"A. I owned it.

"Q. And did you at that time mean by putting Jim's name on the stock he had the right to take the dividends?

"A. No. I didn't give them any right to the dividends.

"Q. Did you at that time feel that you could, if you like, change whoever was on that stock, besides yourself, change the name on it?

"A. Well, I saw no reason for changing the name then.

"Q. Okay. Did you feel at that time you were giving the stock away to Jim, the 498 shares at that time back in 1963?

"A. I didn't feel like I was giving the stock to him. I never felt like giving that stock as long as I lived because that is my protection, I needed that money to live on."

James testified:

"Q. Did you and your mother have some discussions between you and your — between yourselves as to what you were doing, and why you were doing it, and what you intended on doing in making the stock joint, both your stock and her stock?

"A. It is a case of going through probate.

"Q. You and your mother discussed that?

"A. Yes.

"Q. That would be a way of avoiding probate?

"A. Yes.

"Q. Is that why you put Jim on your stock?

"A. Yes.

"Q. Is that why your mother put Jim on her stock?

"A. Yes.

"Q. When you put Jim joint on your stock, was it your intention then to make a present, gift of that stock to him at that time, the stock would become his upon — immediately upon putting his name on it?

"A. No.

"Q. Was it, from what your mother had told you, was her intention to make it an immediate gift of that stock to Jim?

"A. No."

provide for a testamentary disposition of the certificates [of deposit], then the estate must be held to be the owner of them, because the attempt to execute that interest was futile.

"In order to effect a gift *inter vivos* the donor must divest himself of the thing given and transmit the title to it to the donee gratuitously. The gift operates immediately and irrevocably; it is a gift executed; no contingency of death or otherwise is needed to give it effect."

If it is the intention of the alleged donor to transfer a present interest in the putative gift, the fact that the use or enjoyment of the gift is postponed does not defeat the gift. *Allen v. Hedrick, supra,* 104 Or at 226; *see also* Brown, *Personal Property* 48 (2d ed 1955).

■ The question becomes whether plaintiffs, in 1963, intended to transfer to McHale a present interest in the stock and the accounts, with only the enjoyment postponed, or whether they intended that title vest in McHale only on their respective deaths, in which case the transaction is testamentary and void. Our review of the evidence persuades us that, in 1963, neither plaintiff intended to make a gift to McHale "that goes into immediate and absolute effect." *Johnson v. Steen, supra.*

The record is devoid of any evidence of whether plaintiffs relied on the advice of a lawyer, a banker or another person when they created the joint tenancy. Plaintiff Neuschafer testified that she put McHale's name on the stock, "because they said when I passed on it wouldn't have to go through probate." The testimony of plaintiff James is essentially the same. We conclude that the creation of the joint tenancy was intended merely as a substitute for making a will. Each plaintiff unequivocally testified that McHale was to receive nothing until after their respective deaths. That evidence does not persuade us that plaintiffs had a donative intent in 1963 to transfer to McHale a present interest in the stock and the accounts. Plaintiffs are entitled to a declaration that defendant has no interest in the stock or the accounts.

Reversed and remanded with instructions to enter judgment for plaintiffs.