Argued and submitted September 30, 1987, reversed and remanded with instructions; otherwise affirmed March 9, 1988

COX,
*Respondent,*

*v.*

HENDERSON et al,
*Defendants,*

*and*

SANDS et al,
*Appellants.*

(E84-1285; CA A41038)

751 P2d 225

James C. Farrell, Roseburg, argued the cause for appellants. With him on the brief was James C. Farrell, P.C., Roseburg.

Jeffrey L. Pugh, Roseburg, argued the cause and filed the brief for respondent.

Before Warden, Presiding Judge, and Joseph, Chief Judge* and Van Hoomissen, Judge.

JOSEPH, C. J.

---

* Joseph, C. J., *vice* Young, J., deceased.

8

## JOSEPH, C. J.

In this declaratory judgment action, the trial court established a constructive trust in favor of plaintiff for the proceeds of a life insurance policy insuring the life of Ralph Sands, deceased, and also declared that two certificates of deposit are assets of Sands' estate. Defendants[1] appeal and argue that the insurance proceeds and deposits belong to Iver Sands, the deceased's brother. We affirm as to the life insurance proceeds and reverse as to the deposits.

Sands and his wife Ruth were ranchers for many years near Wilbur, Oregon. Ruth died in 1978. Plaintiff Cox had been their friend and neighbor for 36 years. Around the time of Ruth's death, she and her husband purchased the Sands' ranch on "very advantageous terms." Ralph continued to live on the ranch after the Coxes bought it. In early 1981, he contracted cancer and also broke an arm and a hip. After that, it was difficult for him to get around, and Cox helped him in his personal and financial affairs. In April, 1982, Ralph gave her a power of attorney. A doctor told Cox that Ralph might live only a short time. Shortly thereafter, Cox used $20,000 of Ralph's money to purchase a mobile home for him to live in. The home was placed on the ranch. Cox also used $7,000 of Ralph's money to install a deck around the home.

In July, 1982, Ralph became dissatisfied with Cox's management of his money and revoked the power of attorney. Later, the police were called on two separate occasions to escort Cox from Ralph's home and, in February, 1983, she threatened to file a defamation action against Ralph and Iver. By March, 1983, Ralph and Cox were again on good terms.

In April, 1983, Ralph executed his last will, which granted the Coxes an option to buy the mobile home mentioned above, provided for distribution of some personal property and declared that the remainder of the estate was to be divided among nine people: two of Ralph's in-laws, Iver, his sister Mary Marie Tipton and five members of the Cox family. Ralph died on October 3, 1983, owning a $2,400 life insurance policy on his own life and two certificates of deposit totaling

---

[1] Only George Sands, Iver K. Sands and Mary Marie Tipton appeal. However, the errors assigned relate only to Iver. As to George Sands and Tipton, the judgment is affirmed.

more than $13,000. Iver was named beneficiary of the insurance policy and was shown as a joint owner with right of survivorship on the certificates.

■ The issues are: Is Iver, the named beneficiary, or Ralph's estate entitled to the proceeds of the insurance policy? Is Iver or the estate entitled to the deposits? We review *de novo. See Neuschafer v. McHale,* 76 Or App 360, 362, 709 P2d 734 (1985).

■ After his wife died, Ralph named Iver as the beneficiary of the life insurance. Iver was not aware of that until February 23, 1979, when he received a letter from Ralph which told Iver to turn the proceeds over to Ralph's lawyer, because "my funeral expenses will have to be paid from my estate." At that time Ralph's will named his lawyer as personal representative. A subsequent letter told Iver that he should use the proceeds for Ralph's funeral expenses. Iver contends that he never received that letter.[2]

Ralph intended that Iver use the insurance to pay his funeral expenses. Iver understood what Ralph intended, and Ralph knew that Iver understood. Iver testified:

"Q [Plaintiff's attorney]: Okay, there was a conversation either at Ralph's house or over the phone where he told you that he wanted burial funds used or the proceeds from the insurance used for burial expenses, correct?

"A [Iver Sands]: That's correct.

"Q: At that time did you intend to use those funds for burial expenses?

"A: Yes. I did."

Iver also said in a deposition:

"Q: Did you ever have discussions with your brother about what use the life insurance proceeds were to be put to?

_____

[2] That letter provides, in part:

"Dear Iver,

"A few things I want you to do after I am gone. You are to get the insurance money on my Woodman policy. So you will have the money to pay my funeral expenses. I think you will have to come to Roseburg to get the insurance claim filled out. I think my attorney Mr. Carlson will help you fill it out. I want to [be] buried beside Ruth on the Chapman lot. And have the Wilbur Minister conduct the services. Long and Shukle are the funeral directors I would like. And I don't want the expenses to go over $2600.00."

"A: Yes, and it was the same as in the letter.

"Q: Okay. When did you have these conversations with him?

"A: Well, six months to a year ago.

"Q: Okay. Did your brother indicate that he wanted the life insurance proceeds to be paid towards his funeral bill?

"A: Yes.

"Q: Okay. Have you done so?

"A: There was $2,400 left in the checking accounts, and that was—as far as I'm concerned, that was just a trade off: That $2,400 should have gone to the funeral director.—funeral parlor, I should say.

"Q: So it is my understanding that you knew that it was your brother's intent that the life insurance proceeds should be paid to the funeral bill?

"A: Yes."

In *Albino v. Albino,* 279 Or 537, 550, 568 P2d 1344 (1977), the court said:

"A constructive trust arises where a person in a fiduciary or confidential relationship acquired or retains property in violation of his duty to the grantor. The confidential relationship must be one on which the grantor justifiably can and does rely. It is not necessary to prove fraud or intent not to perform by the fiduciary or confidant." (Citations omitted.)

Proof of the basis for a constructive trust must be by clear and convincing evidence. *Pantano v. Obbiso,* 283 Or 83, 87, 580 P2d 1026 (1978). Iver had a confidential relationship with Ralph as to the life insurance proceeds. Ralph relied on him to use the proceeds to pay funeral expenses. The evidence is, at least, clear and convincing that Iver knew what Ralph wanted and that he failed to carry out those wishes.

Iver argues that a constructive trust cannot be imposed, because he never affirmatively represented to Ralph that he would use the proceeds to pay the funeral expenses. Even if he did not, a constructive trust is appropriate when, as is clear here, an obligation can be inferred from the circumstances. *Belton v. Buesing,* 240 Or 399, 407, 402 P2d 98 (1965). The trial court properly imposed a constructive trust on the

life insurance proceeds.[3]

■ After Ralph became ill and somewhat infirm in 1981, he was ambulatory but needed assistance, including help with his financial and business affairs. To that end, Iver and Cox were named as authorized signers on his checking and savings accounts. Iver transferred $18,000 from the checking account to buy a certificate of deposit in order to get a greater return. All of the money was Ralph's, but the certificate was issued in the names of Ralph and Iver as joint owners with right of survivorship. When that certificate matured, Ralph withdrew some money for personal expenses and purchased two certificates, one for $8,000 and one for $5,000. Both were issued in the names of Ralph and Iver as joint owners with rights of survivorship. They were renewed several times and were still in existence when Ralph died.

ORS 708.616(1) applies here. It provides, in part:

"Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent, *unless there is clear and convincing evidence of a different intention at the time the account was created.*" (Emphasis supplied.)

In *Williams v. Mallory,* 284 Or 397, 401, 587 P2d 85 (1978), the court quoted from Wellman, "The Joint and Survivor Account in Michigan - Progress through Confusion," 63 Mich L Rev 629, 645 (1965):

" '[P]eople who use joint and survivorship accounts usually intend the survivorship benefits they express. When such an account is intact at the donor-depositor's death, the estate of the donor, if unable to show fraud, undue influence, or lack of capacity, will probably not prevail if all it can show is that a reason other than to confer benefits at death attended the opening of the account. Probably it must *also* be shown that it would have been capricious or highly unusual for the decedent to have wanted the death benefits to go to the survivor in light of the decedent's circumstances, the pattern of his family relationships, and the terms of his other testamentary directions.' (Emphasis in original.)"

---

[3] Iver argues that ORS 743.099(1) prohibits this action. We disagree. It does not apply here.

Plaintiff argues that she has demonstrated "a different intention" by convincing proof. First, she correctly notes that the certificates were purchased entirely with Ralph's money. However, that is not inconsistent with Ralph's intending to have the money belong to Iver as the survivor. Plaintiff next claims that Iver, not Ralph, initiated their purchase. In fact, however, Iver handled only the purchase of the initial $18,000 certificate, and Ralph personally signed that survivorship account application. When that certificate matured, Ralph himself purchased the two at issue here. Moreover, although Iver renewed them twice, Ralph also personally renewed them twice and apparently never reconsidered the survivorship provisions. Plaintiff also points out that funds withdrawn after the first certificate matured were used for Ralph's expenses only. That clearly suggests that Iver was to enjoy no interest in the funds while Ralph was alive, but it is, at best, weak evidence of what Ralph intended to have happen when he died.

Iver did testify that, if he had been personal representative, he would have put the proceeds into the estate. The record indicates that that reflected his misunderstanding and confusion about the role of a personal representative, but it does not say anything about what Ralph's intent was. Although Ralph may have used the joint account in the hope of lessening his or his estate's tax liability, that is not evidence of a "different intention," but only of a separate, and not inconsistent, intention. Cox has not shown by clear and convincing evidence that Ralph did not intend for Iver to enjoy the proceeds of the certificates.

Reversed and remanded with instructions to enter a judgment declaring the certificates of deposit to be the property of Iver Sands; otherwise affirmed.