Argued and submitted January 30, affirmed November 13, 1991, reconsideration
denied January 8, petition for review denied February 25, 1992 (312 Or 676)

In the Matter of the Estate of
Kenneth John Ruth, Deceased.

THE ESTATE OF
LEDA MAE GROVE,
*Respondent,*

*v.*

Louis L. SELKEN,
*Appellant.*

(86-PB-0006-JT; CA A63903)

820 P2d 895

R. L. Marceau, Bend, argued the cause for appellant. With him on the briefs was Marceau, Karnopp, Petersen, Noteboom & Hubel, Bend.

Michael F. Sheehan, Scappose, argued the cause and filed the brief for respondent.

Before Warren, Presiding Judge, and Riggs and De Muniz, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

A devisee objected to the personal representative's petition for final accounting and distribution of the estate of the decedent, claiming that the accounting was inaccurate. Devisee also claimed that losses to the estate resulted from the personal representative's breach of fiduciary duties. The personal representative appeals from a personal judgment against him.

The facts are drawn primarily from the hearing on the objections to the final accounting. Additional undisputed facts are drawn from the probate court file. We review *de novo.* ORS 19.125(3); *In re Hayes' Estate,* 31 Or App 897, 571 P2d 1264 (1977).

The decedent hired Selken, an attorney, to prepare his will. Selken met him in his hospital room, discussed his affairs and returned later with a completed will, which the decedent signed on November 8, 1985. Selken's wife, Sally, attended both meetings. The decedent was released from the hospital and returned home some time after November 8, 1985. Selken drafted, for the decedent's signature, a petition for appointment of a conservator. The probate court granted the petition on November 26, 1985. The decedent was admitted to a hospital in Portland on December 2, 1985, and died there on January 1, 1986, at the age of 81.

Selken testified that, during the time between the decedent's hospital stays, Sally "started bringing him food and talking with him." According to Selken, Sally was "pretty concerned that [the decedent] didn't have any kind of Christian background and—but she—she did this for a lot of people, I mean, everyone in church."[1] Selken testified that the decedent was a "very intelligent, learned man [who] spoke several languages" and who "frequented the libraries," including the law library. He testified that between November 8, 1985, and December 2, 1985, the decedent was "quite ill, [but] not mentally bad at all."

Selken testified that, "right after" the decedent died, he went to his house, where he found the will in a desk. Folded

---

[1] Sally died after decedent died and before the hearing on the objections to the final accounting was held on July 24, 1989.

with it, he found an undated typewritten document (the book document), which reads:

"Before my will, I give an undivided half intrest [sic] in my books to Sally Selken as a joint owner. I expressly declare this intrest [sic] created to be a joint tenancy with right of survivorship. 105.920. This does not include my plays or foreign language books which she does not care about. She is kind, and admires my books."

The decedent's signature appears at the bottom of the book document. Selken testified that he assumed that it was drafted after the decedent left the hospital after November 8, 1985, but before he entered the hospital on December 2, 1985. He testified that he did not draft the document. He also testified that neither he nor Sally was aware of its existence before it was discovered but that he did not think that Sally was surprised to learn about it. The decedent often gave her books during her visits before his death. He had told her that "he was going to give her his books." He possessed a substantial library of approximately 20,000 volumes.

The decedent was unmarried and had no children. In his will, he gave specific real estate to Pearson, a former student. He gave the rest of his estate to two cousins in Iowa.[2] The will nominates Pearson as personal representative and Selken as the alternate and directs that Selken be retained as counsel for the estate.

In spite of the possibility of a dispute over ownership of the books and the obvious conflict of interest that that dispute would create, Selken sought appointment as personal representative after Pearson declined to serve. Selken, as personal representative, agreed to retain himself as counsel and, as an attorney, agreed to represent the estate. In both capacities, he assumed that the decedent's books, other than the "plays [and] foreign language books," passed to Sally by operation of law at the moment of the decedent's death. Despite that assumption, in an inventory of the estate filed in May, 1986, he listed the value of the books belonging to the estate as $5,233. This was identical to the value that the conservator had placed on the *entire* book collection when the conservator transferred possession of the decedent's property

---

[2] The objector is the estate of one of those cousins.

to Selken as personal representative. Selken did not, at that time, inform the devisees of the existence of the book document.

In July, 1986, the entire collection of books was sold at auction for $66,828.60. No attempt was made to segregate the plays and foreign language books from the books that Selken assumed had passed to Sally. Of the net profit, Sally received $36,794.24; the estate received $12,221.78. Selken testified that Sally paid the estate about $3,416.35 as her portion of the $12,521.08 cost of the sale. However, he did not produce any documentary evidence of that payment.

In April, 1989, more than three years after the decedent's death, Selken filed a petition for final accounting and distribution.[3] That was the first notice that the devisees had that Sally claimed an interest in the books. One of the devisees objected, claiming that all of the book sale proceeds belonged to the estate. The devisee also claimed that Selken, as the estate's attorney, had charged excessive attorney fees and that, as personal representative, he had made other accounting errors. The objector's attorney subpoenaed Selken, putting him on notice that he would be expected to testify and to justify his accounting.

Selken appeared at the hearing without independent counsel. The awkwardness of that situation is obvious, and Selken should have anticipated it. The court pointed out the ethical problems at the hearing. The parties agreed that Selken would testify but that he would retain counsel to argue the case in a brief that would be submitted later.

In October, 1989, Selken's counsel filed motions to allow Selken to withdraw the proposed final accounting, to withdraw as personal representative and to withdraw as counsel for the estate. After several hearings and the submission of extensive briefs, in January, 1990, the probate court disapproved the final accounting and surcharged Selken $36,794.24 to compensate the estate for the amount of money that Sally had received from the book sale; $1,550.88 to compensate the estate for excessive payments that Selken

---

[3] The delay was apparently caused by title problems with decedent's property in Lane County. During that time, the probate court waived the requirement for periodic accounting. ORS 116.083(1)(b).

had made to his relatives and others for work during the book sale; and $2,000 to compensate the estate for excessive attorney fee payments that Selken had made to himself. It entered judgment against Selken personally for $40,345.12, the sum of the surcharges. It accepted Selken's claim, as personal representative, for a total fee of $3,000 but conditioned payment of the $2,000 balance[4] on Selken's paying the estate all of the surcharges. The court disallowed, for lack of evidence, Selken's claim that Sally had paid $3,416.35 into the estate. It awarded the objector attorney fees and costs against the estate and denied Selken's claim for attorney fees. Finally, the court retained Selken as personal representative pending compliance with the court's orders and ordered him to prepare a revised final accounting.

■  The first issue on appeal is whether Sally had any interest in the decedent's books at the time of his death. Selken argues that the book document created a joint interest and that the books passed to Sally by operation of law at the decedent's death. The probate court concluded, as do we, that the books belonged to the estate.

Selken relies on ORS 105.920, which provides, in part:

> "There shall be a form of coownership of personal property known as joint tenancy. A joint tenancy shall have the incidents of survivorship and severability as at common law. A joint tenancy may be created only by a written instrument which expressly declares the interest created to be a joint tenancy. It may be created by a transfer or bequest from a sole owner to others, or to the sole owner and others * * *."

The book document satisfied the statute's requirement for a "written instrument" that "expressly declares the interest created to be a joint tenancy." Selken argues that mere execution of a written instrument is "all that the statute requires for the creation of a joint tenancy." The objector argues that the statute contemplates either a "transfer" from one or more owners to the joint owners or a "bequest" from a testator, neither of which was effective under these facts.

---

[4] Selken had previously received $1,000.

We agree with the objector. The language of the statute indicates that the legislature intended to allow the creation of joint tenancy in personal property[5] but that a *transfer* or *bequest* of the personal property from one or more owners to the joint owners is necessary to create it.[6] The book document could not have been an effective bequest, because it was not witnessed. Thus, if Sally received any ownership interest in the books, it must have been by virtue of an *inter vivos* gift.

The Supreme Court has identified the "essential elements" of an *inter vivos* gift:

> "There must be a donative intent that a gift go into immediate and absolute effect with nothing left undone; there must be delivery with the transfer of possession and dominion over the subject of the gift; and there must be acceptance by the donee." *Manning v. U.S. Nat. Bank, supra* n 5, 174 Or at 131.

*Accord: Johnson v. Steen,* 281 Or 361, 369, 575 P2d 141 (1978).

■■ There was no gift because, whether or not the other elements were met, there was no delivery. Selken, citing *Sautter v. Coffey,* 283 Or 303, 584 P2d 245 (1978), claims that delivery is no longer a necessary element of an *inter vivos* gift under Oregon law. He misreads *Sautter* and erroneously relies on this *dictum*:

> "By our conclusion we do not intend to indicate that a manual delivery of a document of gift or of property which is the subject of a gift is always a necessary prerequisite to the existence of a completed gift if, in fact, it is found that there

---

[5] The statute was enacted in 1975. Legislative history indicates that the proponents of the bill thought that it was necessary because they believed that joint tenancies with the right of survivorship did not exist in personal property in Oregon. However, in 1944, the Supreme Court had said that "the right of survivorship in personal property may be created by express words." *Manning v. U.S. Nat. Bank,* 174 Or 118, 131, 148 P2d 255 (1944). We know of no intervening case or statute that alters *Manning* on that point. *See Gilbert v. Brown,* 71 Or App 809, 817, 693 P2d 1330, *rev den* 300 Or 367 (1985).

[6] Selken cites two cases from other jurisdictions with similar statutes in support of his argument that ORS 105.920 merely requires execution of a writing to create a joint tenancy in personal property. Although isolated language in *Alexander v. Alexander,* 538 P2d 200 (Okla 1975), and in *Weinstein v. Sodaro,* 91 Nev 638, 541 P2d 531 (1975), supports that view, we are unpersuaded by either analysis.

was a present donative intent. See Note, 21 Or L Rev 190 (1942)." 283 Or at 306.

*Sautter* did not, as Selken argues, eliminate the requirement of delivery. It merely restated the long standing rule that delivery may be established by other than manual transfer. In *Waite v. Grubbe,* 43 Or 406, 73 P 206 (1903), *Simonton and Prichard v. Dwyer,* 167 Or 50, 57, 115 P2d 316 (1941), and every Oregon case in which an *inter vivos* gift has been upheld, the donor took some action during his lifetime by which he objectively manifested to another person or entity his subjective donative intent. Here, the decedent signed the book document, but it was neither witnessed nor brought to anyone's attention before he died. Neither Selken nor Sally was aware of its existence before the decedent died.

Our decision does not turn on the decedent's failure to transfer possession of the book document to Sally or some other third party. He simply failed to manifest his donative intent. As we have said: "A gift *inter vivos,* by definition, is perfected during the lifetime of the donor and donee." *Neuschafer v. McHale,* 76 Or App 360, 368, 709 P2d 734 (1985). Delivery as an objective manifestation of donative intent is still necessary in Oregon law, because it is the way a donor gives up the power to revoke the gift. *Liebe v. Battmann,* 33 Or 241, 54 P 179, *on reh'g* 33 Or 247, 252, 54 P 662 (1898). The objective manifestation of the decedent's donative intent did not take place until after his death. Consequently, Sally had no interest in the books at his death, and the book proceeds belong to his estate.[7]

The second issue, one of first impression in Oregon, is whether a probate court has authority to enter a judgment imposing personal liability against a personal representative for breach of fiduciary duties.

Selken claims that he did not breach any fiduciary duties to the estate. We disagree. He breached them (1) when he failed to notify the devisees of the book document within a reasonable time after it was found, (2) decided to accept its validity without the advice of independent counsel in the face

---

[7] Given our disposition of the issue, we need not discuss whether the decedent had the legal capacity to execute the book document, if he executed it after the conservatorship was created.

of adverse claims of the estate and his wife and (3) acted as his wife's agent in the book sale. Moreover, he admitted commingling, without proper accounting, the property that he thought belonged to Sally with the property of the estate. His conflicts of interest should have been obvious to him.

Selken also argues that the legislature intended merely to give the probate court the power to reduce the personal representative's devise or fee, not to impose personal liability on him. He cites cases involving statutory construction that predate the 1969 revision of Oregon probate law. Those cases are not helpful in determining the current powers of the probate court.

ORS 111.095(1) provides:

"The general legal and equitable powers of a circuit court are applicable to effectuate the jurisdiction of a probate court, punish contempts and carry out its determinations, orders and judgments as a court of record with general jurisdiction, and the same validity, finality and presumption of regularity shall be accorded to its determinations, orders and judgments, including determinations of its own jurisdiction, as to those of a court of record with general jurisdiction."

ORS 116.123 provides, in part:

"The court may * * * surcharge the personal representative for any loss caused by any breach of duty."

The issue is what the legislature intended by the word "surcharge." One legal dictionary defines "surcharge":

"The imposition of personal liability on a fiduciary for wilful or negligent misconduct in the administration of his fiduciary duties." *Black's Law Dictionary* 1292 (5th ed 1979).

The legislative intent is clear from the face of the statute: A probate court has authority to enter a personal judgment against a personal representative for wilful or negligent misconduct in the administration of his fiduciary duties.

Selken next argues that the probate court has no authority to impose personal liability, because he had no explicit notice that the objector sought personal liability against him. We reject the argument. Selken knew from the objections to the final accounting that he would be required to

justify his accounting. The allegations of breach of his fiduciary duty gave him notice that the devisees would seek to hold him responsible for any resulting losses.

■ Selken argues that ORS 116.123 violates his right to a jury trial under Article I, section 17, and Article VII (amended), section 3, of the Oregon Constitution. However, supervision of a fiduciary is an equitable power, and there is no constitutional right to a jury trial. *See In re Norman's Estate,* 161 Or 450, 473, 88 P2d 977 (1939).

■ Finally, Selken argues that the probate court erred when it ordered the estate to pay the objector's attorney fees and costs. Selken did not personally have any burden or legally cognizable interest at stake in those payments to objector. Consequently, Selken may not raise this issue. *Kelly v. Silver,* 25 Or App 441, 452, 549 P2d 1134 (1976); *see also In re Estate of Bergeson,* 125 Ill 2d 477, 486, 532 NE2d 825 (1988).

The court disallowed payment in excess of $10 per hour to workers who assisted with the book sale and who cared for and maintained estate property on the basis of a finding that higher wages were excessive. The court also disallowed payment of legal fees to Selken, as attorney for the estate, because it found that much of the work claimed as attorney work was more properly classified as administrative work of the personal representative. We agree with the probate court's findings and find no errors of law.

Selken's remaining arguments do not merit discussion.

Affirmed.